**BAII BANKING CORPORATION, Plaintiff–Appellant,**

**v.**

**UPG, INCORPORATED, Internorth, Incorporated, Defendants–Appellees.**

**No. 961, Docket 91–9022.**

United States Court of Appeals, Second Circuit.

Argued Feb. 6, 1992.

Decided Feb. 11, 1993.

Joseph H. Spain, New York City (Joseph H. Levie, Mark Holland, C. Ryan Reetz, Scott L. Cagan, Chul Pak, Rogers & Wells, of counsel), for plaintiff-appellant.

Joseph P. Cyr, New York City (John Linsenmeyer, Jane M. Knight, Kerri Howland, Morgan, Lewis & Bockius, of counsel), for defendants-appellees.

Before: OAKES, CARDAMONE, and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

Plaintiff BAII Banking Corporation appeals from a judgment entered in the United States District Court for the Southern District of New York, in favor of defendants UPG, Incorporated and Internorth Incorporated, which dismissed plaintiff's complaint, in accordance with a jury verdict, following a trial before Louis L. Stanton, *Judge.*

The judgment in favor of the defendants is reversed and the matter is remanded for further proceedings.

## BACKGROUND

### I. *Procedural Background*

On July 16, 1986, BAII Banking Corporation ("BAII") and Banque Arabe et Internationale d'Investissement ("BAII Paris") commenced an action against UPG, Incorporated and Internorth, Incorporated in the United States District Court for the Southern District of New York; jurisdiction was based upon diversity of citizenship. This action was principally based upon four written agreements dealing with transactions in petroleum products. All of these agreements were between UPG Falco, a division of UPG, Incorporated, which was in turn a subsidiary of Internorth, Incorporated (collectively, "Falco"),[1] and Will Petroleum, Incorporated ("Will"). Two of these four agreements, entered into in December 1985 and January 1986, involved the sale of Rumanian blendstock gasoline from Will to Falco, and for which BAII provided financing to Will. The other two agreements, also entered into in December 1985 and January 1986, were "buy-sell"

1. In a Consent Pre–Trial Order, the parties agreed that Internorth's liability to the plaintiffs would be no greater or less than UPG Falco's liability to the plaintiffs. In addition, effective June 10, 1986, UPG, Incorporated changed its name to Enron Oil Trading and Transportation Company, and Internorth, Incorporated changed its name to Enron Corporation.

agreements for gasoline between Will and Falco.

In the complaint, BAII asserted claims under the two Rumanian blendstock agreements based upon various theories of liability, including BAII's rights as an assignee of Will, and as a third-party beneficiary of these two agreements. BAII also sought recovery claiming that a contract existed between it and Falco, and based upon a promissory estoppel theory. BAII Paris asserted claims under the two "buy-sell" agreements. In their answer, the defendants denied liability, and asserted various affirmative defenses and counterclaims.

Trial commenced in the district court on March 12, 1991. Shortly after opening statements, BAII Paris withdrew its claims on the two "buy-sell" transactions. Therefore, the trial was limited to BAII's claims under the two agreements for the sale of Rumanian blendstock. At trial, BAII called four witnesses: Sally Haswell, a former lending officer at BAII who specialized in oil financing; Anthony Bucci, the Chief Credit Officer and Senior Vice President at BAII in 1985 and 1986; Harry Moore, the General Manager of the shipping agency that performed services with regard to one of the agreements for Rumanian blendstock; and Lars Garrison, who had an extensive background in the petroleum industry, and who was qualified as an expert witness. Falco called five witnesses: Gary Ettelman, an attorney whose law firm held the stock of Will in trust; Roger LeWorthy, the assistant treasurer for UPG Falco in December 1985 and January 1986; Audrey Gothard, a scheduler at UPG Falco for the New York harbor area in December 1985 and January 1986; Susan Ralph, who was qualified as an expert witness in petroleum financing; and Thomas Brunett, the individual in charge of UPG Falco's crude oil and refined products trading group in 1986. In addition, the parties read various portions of certain deposition testimony into the record and introduced various documents into evidence.

At the close of the evidence, BAII moved to strike two of Falco's affirmative defenses. The defenses at issue were based upon the following theories: (1) that the two Rumanian blendstock agreements were voidable because one Joseph DiMauro, the owner of Triad Petroleum, Incorporated ("Triad"), the petroleum products broker for Falco who arranged the two agreements between Will and Falco, had an ownership interest in Will; and (2) that Will had repudiated the two Rumanian blendstock agreements by failing to provide adequate assurances of due performance under N.Y.U.C.C. § 2–609 (McKinney 1964). The district court denied each of these motions. Falco then moved for a directed verdict; the district court denied this motion.

In his charge, the district judge instructed the jury, *inter alia*, to consider: whether Will was ready, willing and able to perform the two agreements at issue; whether Falco was excused from its performance based upon its affirmative defenses; and the amount of damages BAII was entitled to recover, if the jury determined that Falco had breached either agreement. After deliberations, the jury found in favor of Falco with regard to each of the two agreements at issue. Judgment was entered in favor of Falco on April 8, 1991.

BAII moved for judgment notwithstanding the verdict, or, in the alternative, for a new trial. In an Opinion and Order, filed September 20, 1991, the district court denied BAII's motions ("September 20 Order"). BAII filed a timely notice of appeal.

## II. *Factual Background*

### A. Transactional Financing and Prior Dealings Between the Parties

BAII engaged in financing of agreements involving the buying and selling of oil and petroleum products. Under this scheme of financing, a customer of BAII would outline: the terms of what it was buying; from whom it was buying; the quantity being purchased; the date of purchase; to whom it was selling the oil petroleum product; and the sale price. BAII would look at each proposal on a "distinct stand-alone" basis in order to make a decision as to whether and how to finance the transaction.

Will was a small oil trading company. One of Will's specialties was "blending;" under this process, Will would purchase unfinished oil, add a component to boost the octane level and sell the product to oil companies or to other oil trading companies. In order to finance its transactions, Will borrowed funds from a number of banks, including BAII, which provided financing to Will on a transactional basis. As was customary in the industry and to perfect a security interest in Will's assets, Will executed for BAII's benefit a general loan and security agreement, U.C.C. financing statements, a continuing letter of credit agreement and a revolving credit note.

With regard to providing financing to Will, Sally Haswell, a former lending officer at BAII, described the process as follows: by telex, Will would make a proposal to BAII to consider financing a particular transaction; the telex would describe the terms of the transaction, including a description of Will's proposed supplier and Will's proposed buyer. BAII would then review the transaction. During this review, BAII would look to ensure that it— BAII—would be "secured and collateralized" from the beginning to the end of the transaction. The first collateral BAII would look to would be the product itself. In this context, BAII attempted to ensure that the bill of lading, when the product was aboard a vessel, and a warehouse receipt, when the product was in storage on land, were issued or endorsed to the bank. When the product was transferred to Will's buyer, BAII also would look to have "collateral" in the "receivable" from Will's buyer.

In addition, prior to the product being off-loaded, BAII would require Will to have its buyers send a purchase confirmation to BAII. In the purchase confirmation, the buyer from Will would confirm the existence of a contract with Will, the terms of the contract, and to whom the buyer would remit payment. More specifically, the purchase confirmation would instruct the buyer from Will to make payment to a bank that would credit a "BAII account" and further credit a "Will account." According to Anthony Bucci, BAII's Chief Credit Offi-

cer in 1985 and 1986, a purchase confirmation "meant in essence to [BAII] that the proceeds from the sale were assigned to the bank and that the bank had a [sic] security in it and could use the proceeds to repay [BAII's] loan [to Will]." BAII's expert, Lars Garrison, testified:

> [E]verybody in this trade at this time knew well that if you were asked by a supplier to send a telex like this, that the bank had an interest in this cargo in some manner or form, an economic interest, a security interest, if you will. There can be no question in anybody's mind that is in the trade and experienced at this time that when you receive this telex, you kn[e]w the bank was financially involved in some manner or form.

Falco's business involved the transportation and marketing of crude oil and refined oil products. Like Will, Falco also purchased unfinished oil products and blended it with components to increase its octane level. Prior to the agreements at issue, BAII had provided the financing for over fifty transactions between Will and Falco. Haswell testified that BAII received a purchase confirmation from Falco in every transaction between Will and Falco that BAII had financed.

### B. Relevant Agreements

#### 1. The "Dodsland Agreement"—Rumanian Blendstock

On or about December 12, 1985, Will and Falco entered into an agreement ("Dodsland Agreement"), arranged by Triad, under which Will was to sell and Falco was to purchase 30,000 metric tons of Rumanian unleaded blendstock gasoline to be delivered at a point designated on the East Coast of the United States, between January 26 and February 10, 1986. On December 20, 1985, Will sent a telex to BAII requesting that BAII issue a letter of credit in favor of Will's supplier to cover Will's purchase of the 30,000 metric tons of Rumanian blendstock, which were to be loaded aboard the vessel "Dodsland." On this same day, Triad sent a telex, outlining the terms of the Dodsland Agreement between

Will and Falco, to BAII. Also, on December 20, Will sent a telex to Falco requesting that Falco send a purchase confirmation to BAII concerning Falco's purchase from Will under the Dodsland Agreement.

On December 23, 1985, BAII issued the letter of credit as requested. On December 31, 1985, Falco sent BAII a purchase confirmation, which, *inter alia*, stated:

UPG FALCO, A DIVISION OF UPG, INC. CONFIRMS THE PURCHASE FROM WILL PERTROLEUM [sic], INCORPORATED OF 30,000 METRIC TONS OF UNLEADED GASOLINE AT A PLATTS PRICE FOR REGULAR BARGES ROTTERDAM MIDPOINT LESS USD 4.75 PER METRIC TON DURING JANUARY 25–FEBRUARY 10, 1986.

IF UPG FALCO, A DIVISION OF UPG, INC. ACCEPTS DELIVERY OF PRODUCT OUTSIDE OF DELIVERY RANGE THIS PURCHASE CONFIRMATION WILL AUTOMATICALLY BE EXTENDED TO COVER SUCH DELIVERY.

WILL PETROLEUM, INCORPORATED HAS GIVEN UPG FALCO, A DIVISION OF UPG, INC. INSTRUCTION THAT PAYMENT, WHEN DUE, SHOULD BE REMITTED AS FOLLOWS:

REMIT TO: CHEMICAL BANK
NEW YORK, NEW YORK
CREDIT: BAII BANKING
CORPORATION
[ACCOUNT NO.]
FURTHER
CREDIT: WILL PETROLEUM,
INCORPORATED
[ACCOUNT NO.]

UPG FALCO, A DIVISION OF UPG, INC. WILL MAKE PAYMENT AS PER WILL PETROLEUM, INCORPORATED'S INSTRUCTION WITHOUT OFFSET OR COUNTERCLAIM PROVIDING THOSE ARE THE TERMS ON THE INVOICE.

2. The "Konpolis Agreement"—Rumanian Blendstock

On or about January 14, 1986, Will and Falco entered into a second agreement involving Rumanian blendstock ("Konpolis Agreement"). Under the Konpolis Agreement, which also was arranged by Triad, Will was to sell and Falco was to purchase approximately 100,000 barrels of Rumanian blendstock to be delivered to Riverhead, New York between January 21 and January 25, 1986. The product was to be transported on the vessel "Konpolis." Prior to the date on which Will and Falco entered into the Konpolis Agreement, Will had already obtained financing from BAII for its purchase of the Rumanian blendstock loaded on the Konpolis. On January 16, Will sent a telex to Falco requesting that Falco send BAII a purchase confirmation concerning Falco's purchase from Will under the Konpolis Agreement. On January 20, Falco sent BAII a purchase confirmation, which confirmed its purchase from Will of the Rumanian blendstock, in accordance with the Konpolis Agreement. Similar to the purchase confirmation Falco had sent to BAII pursuant to the Dodsland Agreement, the January 20 purchase confirmation stated:

WILL PETROLEUM INCORPORATED HAS GIVEN UPG FALCO, A DIVISION OF UPG, INC. INSTRUCTION THAT PAYMENT, WHEN DUE, SHOULD BE REMITTED AS FOLLOWS:

REMIT TO: CHEMICAL BANK
NEW YORK, NEW YORK
CREDIT: BAII BANKING
CORPORATION,
NEW YORK
[ACCOUNT NO.]
FURTHER
CREDIT: WILL PETROLEUM
INCORPORATED
[ACCOUNT NO.]

By January 23, Falco had made arrangements to blend the cargoes it was to receive pursuant to the Rumanian blendstock agreements into unleaded gasoline and had entered into commitments to sell the unleaded gasoline.

3. The "December 30 Buy–Sell Agreement" and the "January 6 Buy–Sell Agreement"

As will become relevant in our discussion hereinafter, on December 30, 1985, Will and Falco entered into a "buy-sell" transaction ("December 30 Buy–Sell Agreement"). Under Part A of the December 30 Buy–Sell Agreement, Will was to sell and Falco was

to purchase 100,000 barrels of regular gasoline to be delivered to New York harbor between January 15 and January 31, 1986. Pursuant to Part B of the agreement, Falco was to sell and Will was to purchase 100,000 barrels of unleaded gasoline to be delivered to New York harbor between January 15 and January 31, 1986.

On January 6, 1986, Will and Falco entered into another "buy-sell" transaction ("January 6 Buy–Sell Agreement"). Under Part A of the January 6 Buy–Sell Agreement, Falco was to sell and Will was to purchase 100,000 barrels of unleaded gasoline to be delivered to New York harbor during January 1986. Under Part B, Will was to sell and Falco was to purchase 100,000 barrels of regular gasoline to be delivered to New York harbor during January 1986. According to its terms, the agreement was to be performed on a "barrel for barrel" basis. Gothard testified that this meant that Falco and Will would "at the same time or close to the same time to [sic] nominate [to each other] a barge, so that the barrels [could be] move[d] at the same time."

C. December 1985—January 1986

During late 1985 through mid–1986, the market for petroleum products declined. Falco's Roger LeWorthy testified that by late January 1986, he was aware that, due to the decline in the petroleum market, Falco stood to reap a financial gain or advantage if the blendstock agreements were not performed and were canceled.

In early December 1985, Falco's Thomas Brunett and LeWorthy became aware of rumors that Will was having financial trouble. By mid-December, however, these rumors had subsided. In mid-January 1986, the rumors about Will's ability to stay in business and its "severe financial problems" began to re-surface. Falco's Gothard testified that, around January 15, she was informed by a company with whom Falco did business that Will might be filing for bankruptcy, and that Falco should be careful in its dealings with Will. At approximately this same time, Falco had "nominated" 52,000 barrels it was ready to receive under the January 6 Buy–Sell Agreement. However, at this time, Will had not nominated on a reciprocal barrel for barrel basis. Gothard testified that, during the week of January 20, 1986, Falco received telephone calls inquiring as to whether Will was going bankrupt. On January 20, Gothard attempted to contact Will's scheduler by telephone, but was only able to leave messages; Gothard's telephone calls were not returned.

On January 21, one of Triad's traders, Dan Checki, telephoned Jamie Sinclair, a Falco trader, and informed him that it looked like Will was going to file for bankruptcy and that Falco should consider covering its outstanding contracts with Will. The next day, Falco's Gothard contacted Will's scheduler and inquired about the status of the Rumanian blendstock agreements, and asked whether Will was going to file for bankruptcy. Will's scheduler, however, stated that she could not talk. In addition, Falco's Brunett testified that, during the week of January 20, he heard rumors that Richard Willis, whom certain Falco officers and employees believed to be the owner of Will, was "looking for money, ... loading his boat, and ... sailing off to the islands." According to Brunett, between January 20 and January 23, Falco attempted to get Willis to assure it that Will was going to deliver pursuant to the agreements. These attempts were unsuccessful.

Brunett testified that on January 22 or January 23, 1986, he informed Falco's in-house counsel, Greg Jones, and LeWorthy that he did not believe that Will was going to perform and that Falco should go out into the market and cover. According to LeWorthy, Falco was concerned because the month was drawing to a close, and if the agreements between Falco and Will were not performed, then Falco faced the prospect of breaching its other outstanding contracts. However, LeWorthy and Jones believed that Falco should continue to try to work with Will. Therefore, on January 23, Falco purchased high octane gasoline in preparation for blending with the cargoes to be received from Will under the Rumanian blendstock agreements.

Further, LeWorthy testified, that on January 23, he tried to call Willis; a person who identified himself as Willis returned his call on the afternoon of that same day. LeWorthy and that individual discussed a "net-out" proposal under which Will and Falco would cancel their obligations under the two "buy-sell" agreements and "flow [the] value in monetary terms." On January 24, LeWorthy sent a document and a follow-up memorandum, by telecopy, to Will as a result of the above-mentioned discussion. Falco's follow-up memorandum instructed Will to have the banks, to which Falco had sent purchase confirmations, telex their agreement to the proposed cancellation contract relating to the two "buy-sell" agreements.

On January 23, during the conversation among Falco's Brunett, Jones and LeWorthy, Brunett expressed concern to Jones and LeWorthy about Falco's ability to perform its commitments if Will did not perform, and "wanted to move on replacing [the agreements with Will]." In light of this concern, LeWorthy and Jones prepared a telex to put Will on notice that Falco felt insecure concerning Will's ability to perform the agreements and the telex requested, on behalf of Falco, that Will provide adequate assurances that it could perform under the agreements. That telex was sent to Will on January 23, at approximately 4:00 p.m. ("January 23 telex"). The telex stated:

> SUBJECT: CONTRACT NOS. 58222, 58223, 58281, 58440, AND 57999 BETWEEN UPG FALCO AND WILL PETROLEUM
>
> THE ABOVE REFERENCED CONTRACTS COVER PURCHASES AND SALES BETWEEN OUR COMPANIES FOR REGULAR GASOLINE, NO-LEAD GASOLINE AND GASOLINE BLEND STOCK. TO DATE, YOU HAVE NOT NOMINATED FOR DELIVERY THE 200,000 BARRELS OF NO-LEAD GASOLINE UNDER CONTRACT NOS. 58223 AND 58281 AT $.7140 AND $.71 PER GALLON.
>
> REASONABLE GROUNDS FOR INSECURITY ON THE PART OF UPG FALCO HAVE ARISEN WITH RESPECT TO WILL PETROLEUM'S PERFORMANCE AND ITS OBLIGATIONS TO NOMINATE PRODUCT IN ACCORDANCE WITH THE TERMS OF THESE CONTRACTS. THEREFORE, UNDER AUTHORITY OF SECTION 2-609 OF THE UNIFORM COMMERCIAL CODE AND UPG FALCO'S GENERAL TERMS AND CONDITIONS, UPG FALCO HEREBY DEMANDS THAT WILL PETROLEUM PROVIDE UPG FALCO WITH ADEQUATE ASSURANCE (IN THE FORM OF NOMINATIONS FOR THE RECEIPT OF PRODUCT COUPLED WITH ACCEPTABLE SECURITY BEING PROVIDED) OF ITS DUE PERFORMANCE PRIOR TO 3 P.M. CENTRAL STANDARD TIME ON JANUARY 24, 1986.
>
> UPON YOUR FAILURE TO PROVIDE ADEQUATE ASSURANCE, UPG FALCO WILL CONSIDER YOU IN BREACH OF CONTRACT AND WILL NOT ACCEPT ANY DELIVERIES FROM YOU UNDER ANY OF THE ABOVE REFERENCED CONTRACTS AND WILL HOLD YOU LIABLE FOR ANY DAMAGES RESULTING FROM YOUR BREACH.

The contract numbers contained in this demand included the Dodsland Agreement, the Konpolis Agreement, the December 30 Buy–Sell Agreement, and the January 6 Buy–Sell Agreement. Falco did not send BAII a copy of the demand for assurances. LeWorthy testified that, despite calling Willis "a couple of times," he was unable to speak with him on January 24; LeWorthy stated that he did, however, leave messages. There was no response from Will, by telephone or telex, to Falco's demand for assurances. LeWorthy testified that he did speak to Debbie Pirner, a member of Will's finance department, on the afternoon of January 24. According to LeWorthy, although Pirner was aware of the "scope of the problem" with the agreements, Pirner stated that the matter could only be handled by Willis. According to LeWorthy, later in the afternoon of January 24, Brunett, Jones and he confirmed that Will had not responded to the demand for assur-

ances, and agreed that Falco had to consider the agreements repudiated. Toward the evening of January 24, LeWorthy sent a telex to Will. This telex stated: "FALCO HEREBY GIVES NOTICE TO WILL OF THE CANCELLATION OF ALL CONTRACTS NOT FULFILLED BETWEEN THE COMPANIES [AND] CONSIDER[S] THAT WILL HAS REPUDIATED ALL SUCH CONTRACTS...."

On January 27 and January 28, 1986, Falco entered into contracts with other trading companies in substitution for the two "buy-sell" agreements and the two Rumanian blendstock agreements it had with Will. On January 28, Will sent Falco a telex, which threatened legal action if Falco did not perform the Dodsland and Konpolis Agreements, and instructed Falco to contact BAII regarding any insecurity related to Will's ability to perform or Will's creditworthiness. In response, Falco sent Will a telex informing Will that it considered the agreements repudiated by Will, and that it had covered the agreements.

On January 29, Will filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the Southern District of Texas. Two days later, BAII, by telex, informed Falco that it was the assignee of the Dodsland and Konpolis Agreements.

BAII's witnesses presented a different version of the pertinent events. BAII's expert, Garrison, after reviewing a telex dated February 13, 1986, which was written by the shipping agency that serviced the Konpolis and sent to the owners of the Konpolis, testified that on January 20, 1986, Will informed Falco that the Konpolis was scheduled to arrive at Point Judith, Rhode Island, a pilot station near Riverhead, New York, by January 23, 1986. Under the Konpolis Agreement, the product was to be delivered to Riverhead between January 21 and January 25, 1986. Garrison and also Moore, the manager of the shipping agency that serviced the Konpolis, after reviewing certain shipping documents, testified that on January 23, the Konpolis telephoned the pilot station and prepared a notice of readiness to discharge its cargo, which was to be tendered to the terminal operator at Riverhead, and at 1:30 p.m. left Point Judith for Riverhead. At approximately 2:30 p.m., the Konpolis received a call from the terminal operators at Riverhead, and was instructed not to berth at Riverhead, based upon instructions the terminal operators had received from the "cargo receiver[ ]." Garrison testified that the "cargo receiver[ ]" was Falco. Moore testified: "Generally the term 'receiver' refers to the person who ultimately is buying the cargo." Here, the buyer was Falco. The Konpolis was told that there were some financial problems between the "cargo receiver[ ]" and Will. On January 27, 1986, the cargo on the Konpolis was discharged at Riverhead for storage on Will's account.

Under Will's agreement with Falco, the Dodsland had until February 10, 1986 to arrive at Riverhead, New York and discharge its cargo. The deposition testimony of Maureen Townsend, the Falco employee in the scheduling department primarily responsible for cargoes arriving on ships and barges from Europe, was read into evidence. Townsend testified that she had received information from Triad that the estimated time of arrival of the Dodsland and Konpolis in Riverhead was in late January 1986. Falco's Brunett testified, consistent with his earlier deposition testimony, that he knew the Dodsland would arrive in advance of the January 25 to February 10, 1986 delivery period. Garrison further testified that the Dodsland arrived at Riverhead and discharged two cargos, totaling 60,000 metric tons of Rumanian unleaded blendstock, which was twice the amount specified in the Dodsland Agreement, into storage between January 31 and February 2, 1986.

Thereafter, BAII obtained permission from the bankruptcy court to sell the petroleum products in Will's inventory, including the Dodsland and Konpolis cargoes. BAII subsequently sold the two cargoes for approximately $5.5 million less than the amount that had been negotiated under the agreements between Will and Falco.

## DISCUSSION

BAII seeks to reverse the judgment of the district court, asserting that the court erred: (1) by failing to conclude that BAII was entitled to receive notice of Falco's N.Y.U.C.C. § 2–609 demand; (2) by refusing to instruct the jury concerning certain of BAII's theories of liability against Falco; (3) in submitting to the jury the fact issues relating to Falco's affirmative defense that the agreements at issue were voidable because the owner of Triad, the broker for the agreements at issue, allegedly had an ownership interest in Will; and (4) in submitting to the jury the fact issues relating to Falco's affirmative defense that Will had repudiated the agreements at issue under N.Y.U.C.C. § 2–609. The parties do not dispute that New York substantive law governs the issues presented on appeal.

### I. *BAII's Right to Notice of Falco's N.Y.U.C.C. § 2–609 Demand*

■ On appeal, BAII argues that the district court erred in ruling "as a matter of law that BAII was not a 'party' to the Dodsland and Konpolis transactions, and therefore was not entitled to receive notice of Falco's UCC § 2–609 demand."

Section 2–609 of N.Y.U.C.C. provides:

(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

(2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

(3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.

(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

Section 2–609 is part of Article 2 of N.Y.U.C.C.; as stated in § 2–102, Article 2 "applies to transactions in *goods*." N.Y.U.C.C. § 2–102 (emphasis added). By its terms, § 2–609 applies to "contract[s] for sale." Under § 2–106, for purposes of Article 2, the term "contract" is "limited to those relating to the present or future sale of *goods*." *Id.* § 2–106(1) (emphasis added). *See Bankers Trust Co. of Rochester v. Walker*, 49 A.D.2d 670, 671, 371 N.Y.S.2d 198, 200 (4th Dep't 1975); *see also* 93 N.Y.Jur.2d *Sales and Exchanges of Personal Property* § 3, at 21–22 (1991).

Under § 1–201(29), a "party" is defined as "a person who has engaged in a transaction or made an agreement within this Act." N.Y.U.C.C. § 1–201(29). Based upon the evidence presented herein, we do not believe that BAII was a "party" to a contract for the sale of goods—that is, we do not believe that BAII engaged in a transaction or made an agreement for the *sale of goods* as contemplated by Article 2 of N.Y.U.C.C. The record reveals that the Dodsland and Konpolis Agreements were entered into by Will and Falco, as arranged by Triad. Under these agreements, Will was to sell and Falco was to purchase specified amounts of Rumanian blendstock. Significantly, we note that with regard to the telexes sent to Falco by Triad confirming that these agreements had been made, the Dodsland telex does not mention BAII, and while the Konpolis telex does make such mention, BAII is referred to simply as the "SELLER'S BANK." Despite BAII's involvement in the matters herein, we are not persuaded that BAII was a "party" within the meaning of N.Y.U.C.C. § 2–609.

BAII also argues that the district court erred in concluding that N.Y.U.C.C. § 9–318 did not entitle BAII, as an assignee, to notification of the demand for assurances

that Falco sent to Will. We find this argument to be without merit.

Section 9–318(2) provides:

So far as the right to payment or a part thereof under an assigned contract has not been fully earned by performance, and notwithstanding notification of the assignment, any modification of or substitution for the contract made in good faith, in accordance with reasonable commercial standards and without material adverse effect upon the assignee's rights under or the assignor's ability to perform the contract, is effective against an assignee unless the account debtor has otherwise agreed but the assignee acquires corresponding rights under the modified or substituted contract. The assignment may provide that such modification or substitution is a breach by the assignor.

The district court correctly stated that § 9–318(2) "addresses cases in which the obligor and the assignor agree to changes in a contract which adversely affect the rights of an assignee." As discussed in Part II below, BAII was not an assignee of Will.

## II. *Jury Instructions as to BAII's Claims Against Falco*

In its complaint, BAII alleged several bases for its claims against Falco, including BAII's rights as an assignee of Will, and as a third-party beneficiary of the two Rumanian blendstock agreements. BAII also asserted that a contract existed between it and Falco (hereinafter, "BAII/Falco contract"), and that it could recover based upon the doctrine of promissory estoppel. BAII submitted proposed jury instructions and proposed amended jury instructions with regard to these various causes of action.

At trial, the district court, over BAII's objections, charged the jury:

In this case, BAII asserts that Falco breached two contracts with it. The term "breach of contract" simply means failure, without legal excuse, to perform any part of a contract. These contracts concerned two transactions between Falco and Will Petroleum, Inc.

Will Petroleum, Inc., filed for protection under the federal bankruptcy laws ... [and t]he bankruptcy court has released and transferred to BAII certain of Will's rights, including any right it may have to bring an action against Falco in connection with the contracts at issue in this case. Thus, BAII is suing Falco, both in its own right, and on behalf of Will Petroleum, Inc.

. . . .

If you find that Falco breached these contracts with Will, then BAII may recover from Falco for those breaches.

. . . .

For BAII to recover from Falco for breach of contract, it bears the burden of proving that Will was ready, willing and able to perform the contracts, had Falco not terminated them. If BAII does not meet that burden of proof on the evidence presented, then it cannot recover from Falco for breach of contract, and your verdict should be for the defendants. Also, if you find that Will breached any of its material obligations under the contract, your verdict on that contract must be for Falco.

The district court also instructed the jury that Falco had the burden of proving either of its affirmative defenses, namely, that it was excused from its performance because Will repudiated the agreements at issue by failing to provide adequate assurances of performance, or that it was not bound to the agreements at issue because the owner of Triad, the entity that arranged the agreements at issue, had an ownership interest in Will.

In its memorandum in support of its motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial, BAII challenged the district judge's jury instructions; these challenges were rejected by the district court. On appeal, BAII argues that the district court erred in rejecting its requests to instruct the jury specifically on its direct claims against Falco—namely, assignment, third-party beneficiary, breach of contract, and promissory estoppel. BAII maintains that the district court's instructions erroneously covered

only Will's rights against Falco, which were transferred to BAII following Will's bankruptcy.

■ As a preliminary matter, we note: A litigant is entitled to have the jury instructed as to his claims and theories of law if supported by the evidence and brought to the attention of the court.... It does not matter that the evidence was minimal or was presented in a piecemeal fashion. All that is necessary is that there be some evidence supporting a party's theory of the case.

*Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 230 (2d Cir.1991) (citations and internal quotation marks omitted). As a general rule, however, a reviewing court will not upset a judgment because of an error in jury instructions if the charge actually given was correct and sufficiently covered the essential issues. *Id.* at 231; *see Hilord Chem. Corp. v. Ricoh Electronics, Inc.*, 875 F.2d 32, 39 (2d Cir.1989). "A new trial is warranted if, taken as a whole, the jury instructions gave a misleading impression or inadequate understanding of the law." *Plagianos v. American Airlines, Inc.*, 912 F.2d 57, 59 (2d Cir.1990) (per curiam); *see Warren v. Dwyer*, 906 F.2d 70, 73 (2d Cir.), *cert. denied*, 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990). With these principles in mind, we turn to BAII's claims.

■ BAII contends that an assignor's right to receive—and to respond to—a § 2-609 demand for assurances may be acquired by an assignee. BAII asserts that it produced ample evidence at trial to show that Will assigned the Dodsland and Konpolis Agreements to BAII, and that Falco had notice of these assignments. The district court, according to BAII, incorrectly concluded that BAII's rights as a pre-performance assignee were identical to its rights as a post-bankruptcy assignee of Will. BAII also maintains that Falco's failure to provide BAII with notice of its demand for assurances was a violation of Falco's duties of good faith and fair dealing under N.Y.U.C.C. § 1-203.

BAII's claims on these issues fail because there was no evidence presented that Will assigned its rights and delegated its duties to BAII with respect to any demand for assurances that Falco may have sent. Rather, BAII's Haswell testified that Will "assigned" to BAII the proceeds of the sales from the Dodsland and Konpolis Agreements as collateral for the financing that BAII had provided for the transactions. BAII was thus the assignee of a security interest in the receivable created by Falco's performance, and Falco did not have a duty to notify BAII of the demand for assurances that it sent to Will.

Our conclusion is supported by N.Y.U.C.C. § 2–210(4), which distinguishes between an "assignment of 'the contract' or 'all of my rights under the contract' " and other types of assignments, such as an assignment for security. *See* N.Y.U.C.C. § 2–210(4). "Subsection (4) lays down a general rule of construction distinguishing between a normal commercial assignment, which substitutes the assignee for the assignor both as to rights and duties, and a financing assignment in which only the assignor's rights are transferred." N.Y.U.C.C. § 2–210 official cmt. 5. The official comment does note that the original parties may "work out normal commercial readjustments of the contract in the case of financing assignments" and refers to Article 9, the Article on Secured Transactions, as to how to deal with this issue. However, even if BAII was a secured creditor of Will—due to the general loan and security agreement, U.C.C. financing statements, continuing letter of credit agreements and revolving credit note between Will and BAII—under N.Y.U.C.C. § 9–318, BAII was subject to all the defenses that Falco, as the account debtor, had against Will, the assignor. The district judge did not err in refusing BAII's request that it instruct the jury that BAII had a right, as an assignee, to receive notice of the demand for assurances that Falco sent to Will.

■ BAII also asserts that it introduced sufficient evidence to support its claim that it was a third-party beneficiary to the Dodsland and Konpolis Agreements. Under New York law, the essence of which is captured in the approach taken in the Re-

statement (Second) of Contracts, *see* Restatement (Second) of Contracts § 302, a beneficiary of a promise is an intended third-party beneficiary when, *inter alia,* recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and the performance will satisfy an obligation of the promisee to pay money to the beneficiary. *See Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc.,* 66 N.Y.2d 38, 44–45, 485 N.E.2d 208, 212, 495 N.Y.S.2d 1, 5 (1985).

BAII presented evidence that prior to off-loading the product in a BAII-financed transaction, BAII would require Will to have its buyers send a purchase payment confirmation to BAII. In the purchase confirmation, the buyer would confirm the existence of a contract with Will, the terms of the contract and to whom the buyer would remit payment, including an instruction to the buyer to make payment to a bank that would credit a "BAII account" and credit a "Will account." There was also evidence that, in the industry, upon receipt of a purchase confirmation a buyer would understand that BAII had a security interest in the proceeds of the transaction. From this evidence of the parties' actions and the surrounding circumstances, *see Fourth Ocean,* 66 N.Y.2d at 45, 485 N.E.2d at 212–13, 495 N.Y.S.2d at 5–6, the jury could have found that BAII, which was referred to as the seller's bank in the Konpolis telex sent to Falco by Triad confirming that the agreement had been made, was an intended third-party beneficiary of the agreements at issue.

■ Notwithstanding this evidence, the district judge did not err in refusing to instruct the jury regarding BAII's rights as a third-party beneficiary. As a third-party beneficiary, BAII possessed no greater right to enforce a contract than the actual parties to the contract. *See Wasserman v. Weisner,* 36 Misc.2d 916, 917, 234 N.Y.S.2d 128, 130 (Sup.Ct. New York County 1962); *see also* Restatement (Second) of Contracts § 309 cmts. b & c (1981). Accordingly, BAII's rights as a third-party beneficiary are subject to the same defens-

es as Will, its promisee. *See Dunning v. Leavitt,* 85 N.Y. 30, 35 (1881) ("it would be contrary to justice or good sense to hold that [a third-party beneficiary] should acquire a better right against the promisor than the promisee himself had"). The district judge's instruction to the jury that "[f]or BAII to recover from Falco for breach of contract, it bears the burden of proving that Will was ready, willing and able to perform the contracts, had Falco not terminated them," and that if the jury found "that Will breached any of its material obligations under the contract, your verdict on that contract must be for Falco," was correct and sufficiently covered the essential issues regarding BAII's third-party beneficiary claim—subject to the discussion in Part IV below. *See Carvel Corp.,* 930 F.2d at 231.

■ BAII further argues that it presented evidence at trial that the purchase confirmations sent concerning the agreements at issue created a contract between it and Falco. BAII maintains, therefore, that the district court erred in failing to instruct the jury with regard to its BAII/Falco contract claim. In addition, BAII asserts that even if the jury declined to find that the BAII/Falco contract existed, there was sufficient evidence to support its theory of recovery under the doctrine of promissory estoppel. Thus, BAII maintains that the district court's failure to instruct the jury as to its promissory estoppel claim also was erroneous.

The BAII/Falco contract and promissory estoppel claims were based upon the purchase confirmations for the agreements at issue. These purchase confirmations provided,

WILL PETROLEUM, INCORPORATED HAS GIVEN UPG FALCO, A DIVISION OF UPG, INC. INSTRUCTION THAT PAYMENT, *WHEN DUE,* SHOULD BE REMITTED AS FOLLOWS....

(emphasis added). With regard to this clause, the district court, in its September 20 Order, stated: "The purchase confirmations which were the basis of BAII's contract and promissory estoppel claims stated that Falco would pay to BAII the sums it

owed to Will under the [agreements at issue] 'when due,' so if the amounts were not due to Will because Falco had a defense against Will, Falco was not obliged to pay BAII." We believe that, as far as it went, the district court was correct.

At trial, BAII offered evidence in support of its position that the purchase confirmations at issue created a contract between it and Falco. Sally Haswell, a former lending officer at BAII, testified that a purchase confirmation meant that the buyer "confirm[s] the purchase of th[e] oil," and that "once the underlying commercial transaction [wa]s in the works and the product from Will to the buyer is done, then the payment for that product will [be] sen[t] to BAII...." There was testimony by Lars Garrison, BAII's expert witness, that by sending a purchase confirmation, the buyer "confirm[s] that [a contract] does exist and that [it is] going ... through with it."

On appeal, BAII argues that the evidence at trial "demonstrated that the 'when due' clause of the purchase confirmations concerned only the *timing* of payment (*i.e.*, the date payment was due), and not the conditions which determined whether payment would be made." We disagree.

On cross-examination, when questioned with regard to the purchase confirmations, Haswell stated: "The underlying transaction between Will and Falco, if the contract had been satisfied and the product picked up by Falco, [then] Falco ha[d] to pay for the product," and that "when due" meant that "[t]he product is delivered ... and Falco is going to pay when the invoice is due." Haswell further stated that, with regard to the agreements at issue, "because the barrels were never delivered," Falco never received the requisite invoices. Thus, if Will was not ready, willing and able to perform the agreements at issue, or if Falco had a valid affirmative defense to performance of the agreements—*i.e.*, Will repudiated the agreements by failing to provide adequate assurances, to which Falco was reasonably entitled, within a reasonable time or the owner of the broker Triad had an undisclosed ownership interest in

Will—then, we do not believe that Falco would have had any payment obligations under the purchase confirmations because payment would not be "due." However, if Falco engaged in conduct that prevented Will from performing the agreements at issue, and if BAII then proved that Will was otherwise ready, willing and able to perform, BAII could recover under the agreements at issue. *See Bass v. Sevits,* 78 A.D.2d 926, 927, 433 N.Y.S.2d 245, 247 (3d Dep't 1980); *see also* 22 N.Y.Jur.2d *Contracts* § 365, at 259 (1982).

The district court instructed the jury that BAII had the burden of proving that Will was ready, willing and able to perform the agreements at issue, and that Falco had the burden of proving its affirmative defenses. Because BAII's contract and promissory estoppel theories—based upon its alleged rights under the purchase confirmations relating to the agreements at issue—were dependent upon Will being ready, willing and able to perform, and upon Falco not having any valid affirmative defenses, subject to the discussion below, the district court's jury instructions sufficiently covered the essential issues. *See Carvel Corp.,* 930 F.2d at 231.

## III. *The Broker Affirmative Defense*

At trial, Falco offered evidence in support of its affirmative defense that the agreements at issue were voidable because Joseph DiMauro, the owner of Triad Petroleum, Inc.—the broker who had arranged the agreements between Will and Falco—had an ownership interest in Will and that this ownership interest was not disclosed to Falco. We note that there is evidence that demonstrates that DiMauro was the owner of Triad.

Apropos of Triad's role in the agreements at issue, Falco presented the following testimony at trial. Falco's Brunett testified:

A broker is an individual who you take transactions to and ask them to perform the other side in fairness, in trust. You tell them what you want to buy at, what you want to sell at, and I would say that

we treated Joe Di Mauro and Dan Checki [of Triad] in that light.

Brunett also stated that "when you go to the broker, you feel very comfortable that [if] you give him a buying price that's too high, and he knows it's too high, he'll tell you that, and he'll work with you to get you to the cheapest thing he can get for you," and that "you are putting your trust in that individual." With regard to the agreements at issue, Brunett testified that Falco "depended largely upon Joe Di Mauro to tell us the price of Rumanian gasoline." Brunett further testified that "all of th[e] deals [Falco] did with [Will] went through Triad."

With regard to DiMauro's ownership of Will, Gary Ettelman, an attorney who performed services for DiMauro, testified that, in 1982, DiMauro approached him and explained that he wished to make a $1 million loan to Richard Willis so that Willis could operate a petroleum company, but that Willis' bank required that the money "be put in as equity rather than as debt." However, DiMauro did not "want to put the million dollars in equity [and become] a stockholder of the company." Ettelman testified that in response to DiMauro's concerns a trust was created: DiMauro put the $1 million into the trust; Ettelman's law firm then took legal ownership of the stock of the trust; and DiMauro became the beneficial owner of the stock of the trust. According to Ettelman, Willis' authority to bind Will was limited to transactions involving $10,000 or less, pursuant to an employment contract with Will and under its by-laws.

On cross-examination, Ettelman testified that the trust arrangement was terminated in late April 1985 and that he, Ettelman, became the beneficial owner and sole owner of the stock of Will. On re-direct, however, Ettelman stated that one of the reasons DiMauro asked him to consider purchasing Will was that DiMauro was involved in litigation around April 1985 and was concerned that his ownership interest in Will might be revealed to his adversary in his deposition. According to Ettelman's testimony, he did not give DiMauro any cash in exchange for the ownership of Will, but, instead, gave DiMauro a note around April 1985. Ettelman testified that he did not make any payments under the note because Will was in bankruptcy before the first payment was due.

Ettelman further stated that during 1982 through 1986, "in excess of $8 million" was transferred from Will to either Triad or DiMauro in the form of consulting fees. However, according to Ettelman, he was unaware of any consulting services provided by DiMauro during this time.

In addition to Ettelman's testimony, there was further evidence regarding DiMauro's relationship to Will. On cross-examination, BAII's Haswell testified that approximately ninety percent of Will's deals were arranged by Triad. In addition, there was testimony that DiMauro was present at and participated in negotiations between BAII officials and Will officials, in mid-January 1986, relating to Will's financial problems prior to its bankruptcy.

Falco also presented evidence to demonstrate that DiMauro's ownership interest in Will was not disclosed. Falco's LeWorthy, Brunett and Gothard all testified that they believed that Willis owned a major portion, if not all, of Will. Further, LeWorthy testified that he believed Willis was the owner of Will because he "thought the name Will was a derivation of [Willis'] last name," and because a "Dun & Bradstreet report on Will Petroleum indicated that Rich Willis was the majority shareholder."

It was BAII's position at trial that Falco was aware of DiMauro's ownership interest in Will. In support of this contention, BAII offered the deposition testimony of Jamie Sinclair, a trader at Falco who worked on transactions with Will. In his deposition, Sinclair stated: "That there was a connection between Triad and Will, there was some ownership there." According to Sinclair, the basis for this belief was that "Triad did close to 100 percent of Will's business," and that "Will was doing business out of Triad's office." Sinclair further stated that he had this belief prior to December 1985. Sinclair, also stated, however, that he did not have any "knowledge

or information" as to who owned Will, only a "belief."

At the close of evidence, BAII moved for a ruling that Falco's broker affirmative defense failed as a matter of law. The district court denied this motion and allowed it to remain a fact issue for the jury.

With regard to Falco's broker affirmative defense, the district court instructed the jury as follows:

> Falco also contends that it is not bound by the Dodsland and Konpolis contracts, because Joseph Di Mauro, owner of the broker of the contracts, Triad Petroleum, Inc., according to Falco, also owned Will Petroleum, Inc.
>
> A broker, such as Triad, owes a duty of fidelity and good faith to both parties to a petroleum transaction. If the broker is also one of the parties to that transaction and does not disclose that fact to the other party, then the party who was not informed and relied on the independence of the broker is excused from performing that contract, if it was to his disadvantage because of the undisclosed relationship.
>
> However, there is no such duty of disclosure where the broker is only a middleman in the transaction. A middleman is defined as one hired to bring two or more parties together, and when the parties meet, they do their own negotiating and make their own bargain. To be such a middleman, the broker must not be vested with any discretion in formulating the terms of the deal, and the parties to the transaction must not be agreeing to it in reliance on the broker's judgment or representations about its terms.
>
> Therefore, if Falco proves to you by a preponderance of the evidence that Triad, through Di Mauro, owned Will, and that fact was not disclosed to Falco, then Falco may be excused from performing the Dodsland and Konpolis contracts.
>
> However, if you find that Triad did not own Will, or that Triad was only a middleman and that the parties essentially dealt with each other on market terms with which both sides were familiar, then

Falco is not relieved of its obligations under those contracts.

In its memorandum in support of its motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial, BAII argued that there was "no evidence" to support Falco's broker affirmative defense. This argument was rejected by the district court in its September 20 Order.

On appeal, BAII raises several arguments with regard to Falco's broker affirmative defense. BAII claims that it was erroneous for the district court to submit this affirmative defense to the jury because Falco failed to produce any evidence that Triad acted as its broker, or that Falco relied upon Triad's supposed impartiality. We disagree. "A broker is generally defined as an agent who, for a commission or brokerage fee, bargains or carries on negotiations [o]n behalf of his principal as an intermediary between the latter and third persons in transacting business relative to ... the sale or purchase of any form of property...." 11 N.Y.Jur.2d *Brokers* § 1, at 342 (1981); *see Polo v. Lordi*, 261 N.Y. 221, 224, 185 N.E. 80, 81 (1933) ("[A broker] acts as an intermediary between two parties in bringing about a contractual meeting of the minds."). Based upon the testimony of Falco's Brunett, we conclude that the district court did not err in permitting the issue of whether Triad was acting as a broker for Falco to go to the jury.

BAII also claims that based upon the testimony of Sinclair, the issue concerning DiMauro's disclosure of his ownership interest in Will should not have been submitted to the jury because Falco was aware of DiMauro's interest in Will. We are not persuaded.

A broker is a fiduciary; as such, a broker owes a duty of good faith and loyalty to his principal. *See Wendt v. Fischer*, 243 N.Y. 439, 443, 154 N.E. 303, 304 (1926) (Cardozo, J.); *L.A. Grant Realty, Inc. v. Cuomo*, 58 A.D.2d 251, 255, 396 N.Y.S.2d 524, 528 (4th Dep't 1977). Based upon a broker's position of trust, a broker is under a duty to disclose to his principal all the material information that he has

concerning the transaction involved. *See L.A. Grant Realty*, 58 A.D.2d at 255, 396 N.Y.S.2d at 528. Moreover, a broker employed to engage in a transaction on behalf of his principal may not engage in the same transaction on his own behalf "without full and frank disclosure" of his relation to the transaction to his principal. *See Wendt*, 243 N.Y. at 443, 154 N.E. at 304. With regard to the extent of this disclosure, the New York Court of Appeals has stated: "If dual interests are to be served, the disclosure to be effective must lay bare the truth, without ambiguity or reservation, in all its stark significance." *Id.*

Although Sinclair, a trader at Falco, testified that it was his *"belief"* that there was "some ownership" between Triad and Will, he expressly stated that he did not have any "knowledge or information" as to who owned Will. In addition, there was testimony from three Falco officials that it was their belief that Willis was the owner of Will. In light of the inconclusive nature of Sinclair's testimony, and the testimony from the three Falco officials, we cannot conclude that the "truth" concerning the "dual interests" DiMauro was serving—Falco, as its broker, and himself, based upon his ownership interests in Will—was, as a matter of law, "la[id] bare ... without ambiguity or reservation, in all of its stark significance." *See id.* We therefore conclude that there was sufficient evidence from which the jury, if it chose to, could find that the *contracts* DiMauro arranged between Falco and Will were voidable because Falco was unaware of DiMauro's "dual interests" in also having an ownership interest in both Will and Triad. Thus, the district court did not err in submitting this issue to the jury.

Finally, BAII maintains that Falco failed to proffer evidence of injury or disadvantage due to DiMauro's ownership interest in Will. We do not read New York law as imposing such a requirement. *See Wendt*, 243 N.Y. at 443–44, 154 N.E. at 304 ("The law 'does not stop to inquire whether the contract or transaction was fair or unfair. It stops the inquiry when the relation is disclosed, and sets aside the transaction

or refuses to enforce it, at the instance of the party whom the fiduciary undertook to represent....'") (citation omitted); *see also Howard v. Murray*, 43 N.Y.2d 417, 421, 372 N.E.2d 568, 570, 401 N.Y.S.2d 781, 783 (1977) (citing *Wendt*). *But see Bank Brussels Lambert, S.A. v. Intermetals Corp.*, 779 F.Supp. 741, 747 (S.D.N.Y.1991); *Douglas Holly, Inc. v. Rice*, 161 A.D.2d 560, 561, 555 N.Y.S.2d 138, 139 (2d Dep't), *leave to appeal denied*, 76 N.Y.2d 709, 563 N.E.2d 284, 561 N.Y.S.2d 913 (1990). We conclude that BAII's claim is without merit. In any event, the district judge went further than the law required, and instructed the jury that the Falco–Will agreements arranged by Triad were voidable "if it was to [Falco's] disadvantage because of the undisclosed relationship" between DiMauro and Will. Since this instruction was to BAII's benefit, it was harmless error for the judge to include it.

## IV. *The N.Y.U.C.C. § 2–609 Affirmative Defense*

Falco's second affirmative defense at trial was that Will repudiated the agreements at issue by failing to respond to Falco's demand for assurances, pursuant to N.Y.U.C.C. § 2–609, as embodied in Falco's January 23 telex to Will. At the close of the evidence, BAII moved to have Falco's N.Y.U.C.C. § 2–609 affirmative defense stricken as a matter of law. This motion was denied.

With regard to Falco's N.Y.U.C.C. § 2–609 affirmative defense, the district judge instructed the jury:

Falco asserts that it did not breach the contracts with BAII, since it was excused from performing the contracts because Will failed to give Falco adequate assurances that Will would perform.

....

To establish this defense, Falco must prove by a preponderance of the evidence: first, that Falco in fact felt insecure about these contracts; second, that it had reasonable grounds for insecurity about Will's performance of the contracts; third, that it demanded in writing assurances of Will's performance of the

contracts at issue; and fourth, that Falco did not receive, within a reasonable time, assurances of performance that were adequate under the circumstances.

. . . .

. . . . The test is whether Falco had reasonable grounds for believing that Will might not perform, whether Falco in fact felt insecure about that performance, and whether the assurances it demanded were reasonable under the circumstances.

What constitutes a reasonable time for providing assurances that one will perform depends upon the circumstances of the case, including the purpose of the demand and the nature of the transaction.

. . . .

In its memorandum in support of its motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial, BAII argued that Falco's N.Y.U.C.C. § 2–609 affirmative defense was deficient as a matter of law. The district court, in its September 20 Order, rejected this argument.

On appeal, BAII sets forth several arguments with regard to Falco's N.Y.U.C.C. § 2–609 defense. One of the paramount issues throughout this litigation, as framed by BAII, is whether "Falco had [a] reasonable basis for insecurity as to the Dodsland or Konpolis transactions." BAII also contends that this Court should decide whether "Falco's demand [for assurances of due performance under § 2–609 was] unreasonable as a matter of law because it gave Will less than 24 hours to respond." We note that, although BAII's argument regarding the reasonableness of the length of the time to respond was presented to the district court, it was not strongly pressed, and, further, this issue was addressed, albeit fleetingly, only in BAII's reply brief filed in this appeal.

■ As for the first argument, subsection 1 of N.Y.U.C.C. § 2–609 states that a party may in writing demand adequate assurance of due performance "[w]hen reasonable grounds for insecurity arise" with respect to the performance of the other party. Subsection 2 of N.Y.U.C.C. § 2–609 states that "[b]etween merchants the reasonableness of grounds for insecurity . . . shall be determined according to commercial standards." It is generally a question of fact whether a buyer has reasonable grounds for insecurity under § 2–609. *Clem Perrin Marine Towing, Inc. v. Panama Canal Co.*, 730 F.2d 186, 191 (5th Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 515, 83 L.Ed.2d 405 (1984). There are circumstances, however, where this issue may be resolved as a matter of law. *See, e.g., Turntables, Inc. v. Gestetner*, 52 A.D.2d 776, 777, 382 N.Y.S.2d 798, 799 (1st Dep't 1976); *see also Phibro Energy, Inc. v. Empresa De Polimeros De Sines Sarl*, 720 F.Supp. 312, 322–23 (S.D.N.Y.1989) (applying New York law). With the foregoing in mind, we proceed to analyze the events that preceded Falco's N.Y.U.C.C. § 2–609 demand.

■ As noted above, on or about January 14, 1986, Falco and Will entered into the Konpolis Agreement, which called for delivery of the product at Riverhead between January 21 and January 25, 1986. After January 20, 1986, Will did not communicate with Falco in its typical fashion. Falco repeatedly sought assurances that Will would perform the agreements at issue. For example, on January 22, Falco's Gothard sought oral assurances from Will's scheduler, regarding the status of the Rumanian blendstock agreements, but Will's scheduler stated that she could not talk. Between January 20 and January 23, Falco's Brunett also was unable to obtain oral assurances from Will regarding the Rumanian blendstock agreements. Also, during this period, Falco learned that still new rumors had surfaced regarding Will's ability to remain in business. But, importantly, as of the week of January 20, 1986, Falco received information that the Konpolis and Dodsland were expected to arrive at Riverhead in late January. The trial evidence also established that during the time period in question—December 1985 through January 1986—the market prices for gasoline and petroleum products were declining. There was testimony that by

late January, Falco stood to gain nearly a $1.47 million advantage should the agreements at issue not be performed because the general market price had dropped below the contract price provided for in these two agreements.

There was evidence presented, essentially uncontroverted, that on January 23, the Konpolis telephoned the pilot station at Point Judith and prepared its notice of readiness to discharge its cargo, which was to be tendered to the terminal operator at Riverhead, but at approximately 2:30 p.m., on that date, due to instructions sent by the "cargo receiver[ ]," it was not permitted to berth at Riverhead, New York. Garrison testified that the "cargo receiver[ ]" was Falco—again this was essentially uncontroverted. Approximately one and one-half hours later, at 4:00 p.m. that same day, pursuant to N.Y.U.C.C. § 2–609, Falco sent Will a telex demanding assurances of due performance, "PRIOR TO 3 P.M. CENTRAL STANDARD TIME ON JANUARY 24, 1986." Toward the evening of January 24, Falco sent its telex notifying Will that it considered Will to have repudiated the agreements at issue.

Based upon this evidence, which is not really disputed, the district court erred in submitting Falco's N.Y.U.C.C. § 2–609 affirmative defense to the jury, since, under these circumstances, no reasonable factfinder could have found that Falco had "reasonable grounds for insecurity," within the meaning of that section. There was evidence that the terminal operators did not permit the Konpolis to berth at Riverhead, at approximately 2:30 p.m. on January 23, as a result of instructions sent by Falco, and that ninety minutes later Falco sent Will a telex demanding, within twenty-three hours, that Will provide assurances of due performance to Falco as to the Konpolis and Dodsland Agreements. This evidence negates Falco's claim that as of 4:00 p.m. on January 23, it had reason to feel insecure as to whether Will would perform the Konpolis Agreement. Falco cannot rely upon its own conduct in not permitting the Konpolis to berth and discharge its cargo as a basis for a claim of its own insecurity. *See Cherwell–Ralli, Inc. v.*

*Rytman Grain Co., Inc.*, 180 Conn. 714, 433 A.2d 984, 987 (1980). Nor can Falco validly assert that its purported insecurity arose from Will's failure to provide oral assurances before Falco sent the repudiation telex. A party does not contract for oral assurances of performance, but for performance of the contract. *See* N.Y.U.C.C. § 2–609 official cmt. 1. Will's actions in having the Konpolis arrive with cargo before the end of the delivery period provided for in the Konpolis Agreement spoke louder than any oral assurances Will could have provided. As to the Dodsland Agreement, the undisputed evidence reveals that Falco had information that the Dodsland was scheduled to arrive in advance of the expiration of its agreed-upon delivery period, and that the Dodsland arrived at Riverhead and discharged two cargos, totaling 60,000 metric tons of Rumanian unleaded blendstock, twice the amount specified in the Dodsland Agreement, into storage between January 31 and February 2, 1986.

■ Our conclusion with regard to the unreasonableness of Falco's claim of purported insecurity is supported by comments provided to the New York State Legislature with respect to N.Y.U.C.C. § 2–609.

Section 2–609 is drafted in very broad and general terms. The section may be invoked when "reasonable" grounds for insecurity arise; .... In working out the application of this section, courts will face the necessity of resolving two sharply conflicting interests: (1) The danger to one party of future breach by the other; (2) The danger that parties who wish to escape from a contract obligation may make an unfounded claim that their "expectation of receiving due performance" has been "impaired", and use the powers conferred by this section to weaken the security of contractual undertakings. This possibility of such abuse might indicate that courts would be cautious in applying this section of the Code.

1 Report of the Law Revision Commission for 1955: Study of the Uniform Commercial Code, Article 2—Sales 537. We note

**704**

also that Falco's potential gain from the avoidance of the agreements at issue provided an incentive to avoid performance of the agreements. Courts are given broad discretion in applying § 2–609 to guard against "flagrant use of 2–609 as a weapon to avoid unprofitable contracts." James J. White and Robert S. Summers, Uniform Commercial Code § 6–2, at 236 n. 16 (3d ed. 1988) (citing New York Law Revision Commission Study, *supra*, at 537).

A major issue throughout this litigation has been whether Falco had a reasonable basis for insecurity as to the Dodsland or Konpolis transactions. We are constrained to conclude that the essentially uncontroverted evidence reveals that Falco used N.Y.U.C.C. § 2–609 to avoid accepting the cargos from the Dodsland and the Konpolis at a time when these transactions had become unprofitable for Falco. In our view, under these circumstances, Falco did not have reasonable grounds of insecurity to issue the N.Y.U.C.C. § 2–609 demand for assurances; consequently, its N.Y.U.C.C. § 2–609 affirmative defense should not have been submitted to the jury. The jury returned with general verdicts in favor of Falco, and therefore we do not know what effect the improper submission of the N.Y.U.C.C. § 2–609 affirmative defense had upon its deliberations. We are thus compelled to reverse the judgment of the district court and remand for further proceedings. *See Morrisey v. National Maritime Union of America*, 544 F.2d 19, 26–27 (2d Cir.1976) (normally general verdict cannot stand if appellate court does not have sufficient confidence that verdict would have been same if improper claim had not been submitted to jury). Having concluded that no reasonable basis for insecurity existed, we need not and do not discuss whether Falco's demand for assurances of due performance was unreasonable as a matter of law because it only gave Will twenty-three hours in which to respond.

### CONCLUSION

In sum, the district court did not err in concluding that: BAII was not entitled to receive notice of Falco's N.Y.U.C.C. § 2–609 demand; in refusing to instruct the jury concerning certain of BAII's theories of liability against Falco; and in submitting to the jury the fact issues relating to Falco's broker affirmative defense. However, the court erred in submitting to the jury Falco's N.Y.U.C.C. § 2–609 affirmative defense. For the foregoing reasons, the judgment of the district court is reversed and the case is remanded for further proceedings.