**Mary Ann LUCIANO, Plaintiff–Appellee,**

v.

**The OLSTEN CORPORATION; Frank N. Liguori; Gordon J. Bingham; Martin Gelerman, Defendants–Appellants.**

No. 285, Docket 96–7262.

United States Court of Appeals, Second Circuit.

Argued Dec. 11, 1996.

Decided March 21, 1997.

Janice Goodman, Goodman & Zuchlewski, New York City, for Plaintiff–Appellee.

Philip A. Lacovara, Mayer, Brown & Platt, New York City (Gary D. Friedman, Mayer, Brown & Platt, on the brief), for Defendants–Appellants.

Paul D. Ramshaw, Washington, D.C. (C. Gregory Stewart, Gwendolyn Young Reams, Vincent J. Blackwook, on the brief), for Amicus Curiae United States Equal Employment Opportunity Commission.

Laura S. Schnell, Vladeck, Waldman, Elias & Engelhard, P.C., New York City, for Amicus Curiae National Employment Lawyers Association/New York.

Before: OAKES, ALTIMARI and PARKER, Circuit Judges.

ALTIMARI, Circuit Judge:

Plaintiff-appellee Mary Ann Luciano brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.,* alleging that her employer, defendant-appellant The Olsten Corporation ("Olsten"), and three of its executive officers, defendants-appellants Frank N. Liguori, Gordon J. Bingham and Martin Gelerman (together with Olsten, hereinafter collectively "defendants" or the "Company"), failed to grant her a promised promotion to vice-president and subsequently terminated her because of her gender. Following a jury trial in the United States District Court for the Eastern District of New York (Spatt, *J.*), Luciano was awarded $150,714 in compensatory damages, $11,400 in emotional distress damages, $17,713 for other expenses, plus $5,000,002 in punitive damages. Finding that the verdict with regard to liability and damages was supported by the evidence, the district court (1) denied the defendants' motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) or a new trial pursuant to Fed.R.Civ.P. 59(a); (2) denied the defendants' motion to vacate the jury's punitive damage award, but reduced the sum to the statutory cap of $300,000 pursuant to 42 U.S.C. § 1981a(b)(3)(D); and (3) granted Luciano's motion for prejudgment interest. The Company appeals the judgment entered pursuant to the verdict, raising numerous contentions.

For the reasons set forth below, we affirm the judgment of the district court.

## BACKGROUND

A brief summary of the events leading to the present lawsuit, taken in the light most favorable to Luciano, reveals the following.

Olsten is a temporary employment agency. In 1987, Olsten hired Luciano as Director of Field Marketing. Luciano was responsible for developing recruitment and retention programs. By all accounts, Luciano's tenure at Olsten began well; her performance appraisals and evaluations were excellent.

In June 1989, United States West Telephone Company offered Luciano a position of vice president at a salary of $75,000. Then–Chairman and Chief Executive Officer of Olsten, William Olsten, offered to match the offer as an inducement for Luciano to remain in the Company. The Company's senior male executives were not pleased with such a promotion to vice president, and William Olsten accordingly convinced Luciano to accept the lower position of Assistant Vice President, Field Marketing, with the written promise to review her interim performance in a year and promote her to the position of vice president at that time, assuming her performance was acceptable.

Thereafter, Senior Vice Presidents Jerry Kapalko and Clyde Ramsey, Vice President of Human Resources Ed Moretti, and Luciano's then-supervisor Barry McCabe met to formulate a new job description for Luciano, incorporating the duties on the basis of which her performance would be reviewed in July 1990. One or more of the participants re-

sented her rapid rise up the corporate ladder, and the group drew up an impossible job description, designed to ensure that her performance would be unsatisfactory. In addition to her existing duties, Luciano was assigned implementation of the sales proposal program and management of incentive programs to reward top salespeople, responsibilities that were previously handled by Senior Vice Presidents Kapalko and Ramsey.

In April 1990, Liguori succeeded William Olsten as Chairman and Chief Executive Officer, and Bingham replaced McCabe as Luciano's supervisor. In the Spring of 1990 and thereafter, Luciano's job responsibilities were further increased. Bingham assigned Luciano to be the executive director of a newly established marketing advisory committee and director of direct mail and telemarketing, along with additional duties, including development of scripts and video production for the vendoring program, development of collateral target account programs and the development of new incentive programs. Although Bingham increased Luciano's duties, he failed to provide her with support staff commensurate with her new responsibilities. Luciano did not receive the promised performance review for her promotion in July 1990 or any time thereafter.

In June 1992, Bingham informed Luciano that her employment with the Company was terminated, claiming that her position was being eliminated as part of a corporate reorganization. Luciano's job responsibilities were distributed to two male executives, one of whom was a senior vice president and the other who was recruited and hired from outside the Company. Although equally qualified as the men who succeeded her, Luciano was not given the opportunity to assume one of these positions. Luciano sought to find another position at Olsten for which she was qualified, but Senior Vice President and Director of Human Resources Gelerman rebuffed her inquiries about a regional director vacancy without investigating her qualifications.

Thereafter, Luciano timely filed charges of gender-based discrimination with the United States Equal Employment Opportunity Commission, and on November 8, 1993 commenced this action against the defendants, alleging that the defendants violated her rights under federal and state anti discrimination statutes. Luciano claimed that gender-based discrimination foreclosed her opportunity to attain the highest level management positions at Olsten, whose workforce (except at the upper-management level) is predominately female.

Following a month-long trial, the jury returned a verdict in favor of Luciano on November 9, 1995, and awarded her $150,714 in compensatory damages, $11,400 in emotional distress damages, $17,713 for other expenses, plus $5,000,002 in punitive damages. The defendants moved for an order granting them judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b), a new trial pursuant to Fed.R.Civ.P. 59(a), or in the alternative for remittitur of the jury's damage award. Luciano cross moved for an order granting her prejudgment interest on the compensatory damage award. The district court denied the defendants' motions, granted Luciano's cross motion and ordered that the punitive damages award be reduced to $300,000 pursuant to 42 U.S.C. § 1981a(b)(3)(D).

This appeal followed.

## DISCUSSION

On appeal, defendants raise numerous challenges to the verdict, principally pursuing their contention that they were entitled to judgment as a matter of law, a new trial, or, in the alternative, relief from the damages awards. We disagree.

### (A) *Judgment As A Matter of Law*

Judgment as a matter of law may only be granted if there exists "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," or the evidence in favor of the movant is so overwhelming "that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Cruz v. Local Union No. 3*, 34 F.3d 1148, 1154 (2d Cir.1994) (internal quotations omitted). In reviewing the denial of judgment as a matter of law on appeal, we must view the evidence in the light most

favorable to the nonmoving party and may reverse the denial of judgment as a matter of law only if the evidence is such that, with credibility assessments made against the moving party and all inferences drawn against the moving party, there can be but one conclusion as to the verdict that reasonable jurors could have reached. *See Equal Employment Opportunity Comm'n v. Ethan Allen, Inc.,* 44 F.3d 116, 119 (2d Cir.1994).

■ A plaintiff in an employment discrimination case bears the initial burden of " 'proving by the preponderance of the evidence a prima facie case of discrimination.' " *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510 n. 3, 113 S.Ct. 2742, 2748, 125 L.Ed.2d 407 (1993) (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)); *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The plaintiff's burden of establishing a prima facie case of employment discrimination is "not onerous." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. Direct evidence is not necessary, and a plaintiff charging discrimination against an employer is usually constrained to rely on the cumulative weight of circumstantial evidence. *See Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir.1991) ("An employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent.").

■ In order to establish a prima facie case of gender-based discrimination under Title VII, the plaintiff need only offer evidence that "she was treated less favorably than comparable male employees in circumstances from which a gender-based motive could be inferred." *Montana v. First Fed. Sav. and Loan Ass'n of Rochester,* 869 F.2d 100, 106 (2d Cir.1989). Although the burden of production then shifts to the defendant to articulate a nondiscriminatory reason for the challenged employment decisions, *see Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094, once the defendant proffers a legitimate motive, the presumption of discrimination triggered by the prima facie case no longer operates, *see St. Mary's,* 509 U.S. at 507, 113 S.Ct. at 2747. At that point, the plaintiff has the opportunity to demonstrate that defendant's articulated reason for its decision is in fact a pretext for discrimination and retains the ultimate burden of persuasion to demonstrate by a preponderance of the evidence that the challenged employment decision was the result of intentional discrimination. *See id.* at 507–08, 113 S.Ct. at 2747–48.

■ We now turn to Luciano's claim. Luciano presented a prima facie case of discrimination by showing that she was a qualified woman who was discharged following the Company's written promise that she would be considered for a promotion to the position of vice president under circumstances which support an inference of gender-based discriminatory intent. To begin with, the jury heard testimony that: (i) William Olsten admitted that when he promoted Luciano in 1989, senior men in the company complained that she could not do the job; (ii) senior vice president Ramsey stated, "Mr. Olsten shouldn't have promised [Luciano] the vice presidency;" (iii) Bingham, who became Luciano's supervisor in April 1990, admitted that "there certainly wasn't any intention on my part to consider her for promotion to vice president;" (iv) Bingham intentionally gave Luciano an impossible work load without commensurate support staff; and (v) Luciano was denied the promised review and was not promoted to vice president, despite the fact that she capably performed jobs that were previously or subsequently performed by senior vice presidents Allan Gershlak, Ramsey and Kapalko. Further, the jury heard testimony that the Company: (i) promoted male employees with poor performance records to senior management positions; (ii) created new positions for male employees whose positions were eliminated; (iii) never offered Luciano, who had an excellent performance record, another position when Olsten allegedly eliminated the one she held; and (iv) denied her the opportunity to fill other job vacancies, such as regional director, for which she was qualified.

The Company articulated nondiscriminatory reasons for its employment decisions; namely (i) deficient performance and (ii) corporate reorganization. We find, however, that a reasonable jury could have determined

that Luciano adduced by a preponderance of the evidence not only that the Company's proffered reasons were pretextual, but that the Company acted with discriminatory intent when it failed to grant her the promised performance review for a promotion to vice president and ultimately terminated her employment.

First, with respect to the defendants' claim of poor performance, Luciano presented evidence of consistently excellent performance reviews. Moreover, the jury considered evidence that male employees with poor performance records were treated more favorably than higher performing women such as Luciano. For example, Fred Henry, Henry Pittius and Joseph Stefanelli, who were responsible for over a $3 million loss to the Company, were nevertheless given promotions, salary raises and transfers to better positions when their unit was dissolved for lack of productivity. As another example, the jury considered evidence that Gershlak was fired as vice president of marketing due to deficient performance, but was rehired less than a year later into a higher position of senior vice president of the Northeast Region, and was transferred to the position of senior vice president of sales and partnership even though his performance was again found to be unsatisfactory.

Second, with respect to defendants' claim that Luciano's position was eliminated as part of a corporate reorganization, the jury heard testimony that after Luciano's termination in June 1992, her responsibilities were distributed between two men: (1) Gershlack, whose unsatisfactory job performance as a regional director resulted in his transfer into the Marketing Department where he was made senior vice president of sales and partnership programs, and (2) Burt Slatas, who was recruited and hired from outside the Company. Within two months of Luciano's firing, two positions were created in the Marketing Department which were filled by two men, Ken Pascal and Stuart Owens. Neither position was budgeted in the 1992 Business Plan, nor were these positions reflected in the Company's Organizational Chart at the beginning of the year. While Luciano was equally qualified as the men who assumed

her position, she not only was never given the opportunity to assume one of those jobs, but was also denied the opportunity to fill other job vacancies at Olsten which she requested and for which she was qualified.

In addition to evidence that male executives were treated more favorably than Luciano, the jury considered statistical data which reflected a glass ceiling at the Company and disparity of pay. As evidence of the Company's pattern and practice of discrimination, Luciano presented the following statistics. With respect to the 200 to 300 field offices that comprise the Office Services Division of the Company: (1) more than 80 percent of those offices were run by female branch managers who were considered "junior management," and (2) there were no female vice presidents or senior vice presidents in the Office Services field organization. At corporate headquarters, all positions at the senior management level, vice president and senior vice president, were held by males with the exception of Vice President of Office Administration whose responsibilities include groundskeeping, mail room, print shop, and other similar activities. In addition, Luciano offered evidence of a wage disparity between men and women at the same job level. For example, there was a $10,000 disparity between the average salary for men and women at the Director's level.

Finally, despite such statistical evidence of wage disparities between men and women in upper level management positions at the Company, as well as disparities in the numbers of men and women holding these positions, the jury also considered testimony by Director of Human Resource Service Department Gelerman that he did not investigate the gender-based disparities in the Company's workforce, nor did he have a policy or practice of investigating terminations to assure that they were nondiscriminatory.

In sum, Luciano's showing of pretext was probative of intentional discrimination on the basis of her gender. Viewing the evidence in the light most favorable to Luciano, a reasonable jury could infer by a preponderance of the evidence that the Company intentionally discriminated against Luciano on the basis of her status as a woman when it failed to

review her performance for a promotion and subsequently discharged her. Accordingly, because we cannot conclude that the verdict in Luciano's favor was the result of "sheer surmise or conjecture," we find the district court properly denied the motion for judgment as a matter of law.

### (B) *New Trial*

We next consider whether the district court erred in denying the defendants a new trial. Defendants contend principally that: (1) the district court should have excluded statistical compilations from the evidence at trial, and (2) the jury's finding of intentional discrimination was based on erroneous and misleading jury instructions. We review a district court's decision to grant or deny a motion for a new trial for an abuse of discretion. *See Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir.1992).

### (1) *Admission Of Statistical Compilations Into Evidence*

The Company contends on appeal that the district court's admission of Luciano's statistical compilations into evidence fatally tainted the verdict. The contention is groundless.

This Court will not disturb the district court's evidentiary rulings unless they are "'manifestly erroneous.'" *Proteus Books Ltd. v. Cherry Lane Music Co.*, 873 F.2d 502, 514 (2d Cir.1989) (citations omitted). Moreover, we will not grant a new trial unless we find that the introduction of inadmissible evidence was a clear abuse of discretion and was so clearly prejudicial to the outcome of the trial that we are "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Hygh v. Jacobs*, 961 F.2d 359, 365 (2d Cir.1992) (internal quotations omitted). We measure prejudice by assessing the error in light of the record as a whole. *See id.*

In reviewing the record as a whole in the case before us, we find that contrary to the Company's assertion, the district court's admission of Luciano's statistical data was not manifestly erroneous. The proffered data consisted of two primary exhibits. The first exhibit, a bar graph, demonstrated that as of July 1, 1992, the date Luciano was terminated from her position: (a) women occupied at least 80% of the lower level professional and managerial jobs; (b) women occupied between 60–65% of the middle level management positions; and (c) there was only one female vice president and no females in positions of senior vice president or higher. The second exhibit, a chart, reflected the number of women and men, together with their percentage of the workforce in each position from director through Chairman/Chief Executive Officer and the average salaries for each of those positions as of July 1, 1992.

The district court's decision to admit this evidence was made only after review of the parties' briefs and oral argument, and only after it properly concluded that: (1) the statistics were relevant for the limited purpose offered by Luciano, as one piece of circumstantial evidence supporting her claim of pretext, *see Hollander v. American Cyanamid Co.*, 895 F.2d 80, 84 (2d Cir.1990) ("It is well-settled that an individual disparate treatment plaintiff may use statistical evidence regarding an employer's general practices at the pretext stage to help rebut the employer's purported nondiscriminatory explanation."); (2) the raw data was credible and reliable because it came from Olsten's records and admissions, *see Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 872–73 (2d Cir. 1992); (3) the data was probative of discriminatory intent because a sufficiently relevant labor pool was identified through the Company's admissions; (4) an expert was not necessary because the data offered was not of a scientific nature but merely reflected existing conditions at the Company at the time of Luciano's termination; and (5) the evidence did not unduly prejudice the defendants. The record shows that the district court gave the Company ample opportunity to rebut Luciano's data, including permitting it to introduce new statistical evidence at trial and the opportunity to present expert testimony.

In addition, the district court gave the jury a cautionary instruction regarding the statistics:

I caution you that the usefulness of statistics and numbers depends on all the surrounding facts and circumstances. In other words, the statistics and numbers offered must be compared with a number of factors, including, among other factors, the relevant labor market, including the qualified applicant pool, the relative numbers of men and women who were both qualified for and interested in management jobs with the Olsten company.

It is for you, the jury, to weigh all the statistical, numerical and graph evidence presented by the parties and decide what weight and significance, if any, you want to give to it.

Accordingly, because (1) we see no manifest error in the district court's decision to admit the statistical data into evidence, and (2) in light of all the other evidence supporting the inference of intentional discrimination, we are not "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice," the motion for a new trial was properly denied. *Hygh,* 961 F.2d at 365 (internal quotations and citation omitted).

### (2) *Jury Instructions*

On appeal, the defendants contend principally the district court erred by purportedly giving a "mixed motive" instruction to the jury, rather than a "pretext" charge. According to the defendants, by instructing the jury that the plaintiff need only prove that the alleged discriminatory animus was a "motivating factor" in the defendants' employment decision, the district court improperly allocated the burdens of proof in the case and confused the jury. We disagree.

■■■■ It is well-established that a jury charge is erroneous if the instruction misleads the jury as to the proper legal standard, or it does not adequately inform the jury of the law. *See Schermerhorn v. Local 100, Transp. Workers Union,* 91 F.3d 316, 322 (2d Cir.1996). In examining a challenge to the district court's jury charge, this Court reviews the jury instructions as a whole, and we will "not upset a judgment because of an error in jury instructions if the charge actually given was correct and sufficiently cov-

ered the essential issues." *BAII Banking Corp. v. UPG, Inc.,* 985 F.2d 685, 696 (2d Cir.1993). Further, we will not grant a new trial, unless, "taken as a whole, the jury instructions gave a misleading impression or inadequate understanding of the law." *Id.* (internal quotations omitted).

■■■■ Employment discrimination claims generally fall into two categories: "mixed motive" cases and "pretext" cases. *See Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1180 (2d Cir.1992). In a mixed motive case, there is credible evidence of both permissible and impermissible factors influencing the challenged adverse action. *See Hargett v. National Westminster Bank,* 78 F.3d 836, 840 (2d Cir.), *cert. denied,* — U.S. —, 117 S.Ct. 84, 136 L.Ed.2d 41 (1996); *Ostrowski v. Atlantic Mut. Ins. Co.,* 968 F.2d 171, 180–81 (2d Cir.1992). In such a case, once the plaintiff sustains the burden of proving, that despite the presence of permissible factors, an impermissible factor had a "motivating" role in the employment decision, *Ostrowski,* 968 F.2d at 180 (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 247, 109 S.Ct. 1775, 1788–89, 104 L.Ed.2d 268 (1989) (plurality opinion)), the burden of persuasion shifts to the employer to prove as an affirmative defense that it would have made the same decision even in the absence of the discriminatory factor. *See id.; Cabrera v. Jakabovitz,* 24 F.3d 372, 382–83 (2d Cir.1994).

■■■■ By contrast, in a pretext case, the burden of persuasion never shifts. After the plaintiff has established a prima facie case of gender-based discrimination in a pretext case, *see St. Mary's,* 509 U.S. at 502–06, 113 S.Ct. at 2744–47; *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824, the defendant does not bear the burden of proving that gender was not a factor in its decision. Rather, once the employer articulates a legitimate reason for its decision, the ultimate burden of proving that the challenged employment decision was the result of intentional discrimination remains with the plaintiff. *See St. Mary's,* 509 U.S. at 511, 113 S.Ct. at 2749–50.

With these considerations in mind, we turn to the instructions given in this case. A review of the jury charge as a whole indicates that, contrary to the Company's assertion, the charge properly apprised the jury that the plaintiff bore the ultimate burden of establishing discrimination. For example, in the following passages the jury charge made clear that the burden of persuasion is on the plaintiff:

> The plaintiff Luciano has the burden of proving every disputed element of her claims to you by a preponderance of the evidence. That burden always remains on the plaintiff.
>
> [T]he ultimate burden of persuading you that the defendants discriminated against the plaintiff motivated by her gender remains at all times with the plaintiff.
>
> [P]laintiff must prove by a preponderance of the evidence that the reasons advanced by the defendants for their actions were but a mere pretext or cover up for what was in truth a discriminatory purpose. . . .

■ The Company contends, however, that the district court's instruction that discrimination must be "a motivating factor" in the defendants' actions, rather than a "determinative" reason for the challenged decision, overshadowed the correct standard. Viewing the jury charge as a whole and in light of the evidence, we find that any divergence between the meaning of "motivating" and "determinative" as used by the district court in its jury charge was merely a distinction without a difference.

Significantly, the record indicates that when the district court instructed the jury, it carefully explained the meaning of "motivating factor":

> What does 'motivating factor' mean? The law requires that the employer ignore sex or gender when making employment decisions. The law does not require the plaintiff to show that her gender was the sole factor in the defendants' employment decisions. The plaintiff can show that the defendants took their actions against her for a variety of reasons, some of which may include job performance and other business decisions, but that these reasons were not the only reasons for their actions.

> The plaintiff must show that her gender played a role in the defendants' decision making process *and had a determinative influence on the outcome.* (emphasis added).

The court then underscored the point when it explained, "When I say motivating factor, I mean that her gender had a determinative influence on those decisions."

Given (1) the district court's repeated instruction that the plaintiff bore the burden of proving discrimination, and (2) the district court's clarification that "motivating factor" is one having a "determinative influence" on the outcome, we believe that the jury could not have been led astray by the court's use of the statement that the plaintiff need only prove that the alleged discriminatory animus was a "motivating factor" in the defendant's employment decision. Accordingly, reviewing the jury instructions as a whole, we find that the instructions were "fundamentally correct and sufficiently covered the essential issues."

### (C) *Punitive Damages*

The Company contends that the district court should reverse the punitive damages award, grant a new trial on punitive damages or remit the punitive award to an amount well below the statutory limit because (1) Luciano failed to show that the Company's conduct was "extraordinarily egregious," and (2) the statutory cap amount should be reserved for the most egregious cases of employment discrimination. The Company's contention is unpersuasive.

### (1) *Statutory Standard For Punitive Damages Award Under Title VII*

The Company argues that Section 1981 of the Civil Rights Act of 1991 was intended to limit the availability of punitive damages to cases of "extraordinarily egregious" conduct.

■ By its terms, the Civil Rights Act of 1991 ("CRA"), 42 U.S.C. § 1981a(b)(1), permits an award of punitive damages whenever a plaintiff proves that a defendant discriminates "with malice or with reckless indifference to the federally protected rights of an

220

aggrieved individual." We find nothing in the language of the statute to support the Company's argument that there must also be a finding that the defendants' conduct was "extraordinarily egregious." The language of the punitive damages provision is the same as the language used in other civil rights laws, which do not require such a showing. *See Rowlett v. Anheuser–Busch, Inc.,* 832 F.2d 194, 205 (1st Cir.1987) (punitive damages available for claims of race discrimination under 42 U.S.C. § 1981 where defendant's conduct is motivated by an evil motive, or involves reckless indifference to federally protected rights); *Beauford v. Sisters of Mercy–Province of Detroit, Inc.,* 816 F.2d 1104, 1108–09 (6th Cir.1987) (same); *see also Smith v. Wade,* 461 U.S. 30, 55–56, 103 S.Ct. 1625, 1639–40, 75 L.Ed.2d 632 (1983) (holding Congressional intent to permit punitive damages awards for § 1983 violations under the same principles governing awards of punitive damages under common law—when conduct is "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others"). Nothing in the statute's text indicates a heightened standard was meant to apply to Title VII cases.

Olsten contends that remarks of Senator Dole and Representative Hyde in the Congressional Record, which were referenced by President Bush at the time of signing, support its interpretation that the punitive damages provision requires a showing of 'extraordinary egregious' conduct. The short answer to this is that the plain language of the statute, which tracks the language of existing civil rights laws that do not require such a showing, is inconsistent with these statements. Moreover, a more thorough review of the legislative history indicates that these stray comments do not accurately reflect the general understanding of the provision. The committee reports state that the provision incorporates the standard in other civil rights laws. *See* H.R.Rep. No. 40(I), 102d Cong., 1st Sess. 74 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 612 (citing *Rowlett v. Anheuser–Busch, Inc.,* 832 F.2d 194, 205 (1st Cir.1987); *Beauford v. Sisters of Mercy–Province of Detroit, Inc.,* 816 F.2d 1104, 1108–09 (6th Cir.1987); *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983)); H.R.Rep. No. 40(II), 102d Cong., 1st Sess. 29 (1991), *reprinted in* 1991 U.S.C.C.A.N. 722 (noting that the standard for punitive damages is taken directly from civil rights case law).

Notably, the sponsors of the CRA themselves observed in an interpretive memorandum, "[p]unitive damages are available under [Section 1981a] to the same extent and under the same standards that they are available to plaintiffs under 42 U.S.C. § 1981." 137 Cong. Rec. H9527 (1991) (statement of Rep. Edwards); *see also* H.R.Rep. No. 40(II), 102d Cong., 1st Sess. 24 (1991), *reprinted in* 1991 U.S.C.C.A.N. 717 ("It is the Committee's intention that damages should be awarded under Title VII in the same circumstances in which such awards are now permitted under [42] U.S.C. § 1981 in intentional race discrimination cases."). Any different result would contravene Congress's express purpose of equalizing the remedies available for race and other forms of discrimination.

Accordingly, we find that the district court properly rejected Olsten's contention that a plaintiff must make an additional showing beyond that provided in the statute to obtain an award of punitive damages under § 1981a(b)(1).

### (2) *Reduction of Punitive Damage Award Below Statutory Cap*

The Company argues that the district court was required to reduce the jury's award of damages to an amount below the limitation provided by Congress for an employer of its size because the cap amount should be reserved for only the most egregious cases of employment discrimination.

Section 1981a provides that, in addition to the relief already available under § 706(g) of Title VII, a complaining party suing under Title VII or ADA "may recover compensatory and punitive damages as allowed in subsection (b)." 42 U.S.C. § 1981a(a)(1). Subsection (b)(3) provides in relevant part that "[t]he sum of the amount of compensatory damages ... and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party," an

aggregate amount according to the size of the employer, expressed in terms of the number of persons employed. *Id.* Subsection (c)(2) prohibits the court from "inform[ing] the jury of the limitations described in subsection (b)(3)."

When viewed as a whole, therefore, § 1981a envisions that the level of punitive damages to be awarded will initially be set by the jury, and that the jury will make that determination without being influenced by the statutory caps. *See* 42 U.S.C. § 1981a. The jury is to be guided by the same principles that have traditionally guided such determinations: the amount necessary to punish the defendant for its conduct and to deter the defendant and other employers from engaging in such activity in the future. *See, e.g., Rowlett,* 832 F.2d at 205. Then, if the sum of the compensatory and punitive damages awarded by the jury exceeds the relevant cap, the district court reduces the award to ensure that it conforms with subsection (b)(3); that is, that it "[does] not exceed" the relevant cap for an employer of the defendant's size. *See, e.g., Hogan v. Bangor & Aroostook R.R. Co.,* 61 F.3d 1034, 1037 (1st Cir.1995).

Nothing in the language of the statute suggests that the cap on damages is intended to diminish the jury's role in assessing punitive damages or to alter the standard for judicial review of such awards. The legislative history of the provision confirms that it is not meant to exert upward or downward pressure on the size of jury awards. *See* 137 Cong.Rec. S15484 (1991) (statement of Sen. Danforth). Rather, the purpose of the cap is to deter frivolous lawsuits and protect employers from financial ruin as a result of unusually large awards. *See* 137 Cong.Rec. S15472 (1991) (statement of Sen. Dole); 137 Cong.Rec. S15478–79 (1991) (statement of Sen. Bumpers). The statutory limitation is not an endpoint of a scale according to which judges might recalibrate jury awards. *See* H.R.Rep. No. 40(I), 102d Cong., 1st Sess. 72 (1991), *reprinted in,* 1991 U.S.C.C.A.N. 610 (recognizing jury's role in "determining whether an award of damages is appropriate and if so, how large it must be to compensate the plaintiff adequately and to deter future

repetition of the prohibited conduct"). Only where an award would " 'shock the judicial conscience and constitute a denial of justice,' " for example because it would "result in financial ruin of the defendant" or "constitute a disproportionately large percentage of a defendant's net worth" and thereby violate due process, should the court reduce an award of punitive damages to below the appropriate cap. *Vasbinder v. Scott,* 976 F.2d 118, 121 (2d Cir.1992); *see Lee v. Edwards,* 101 F.3d 805, 808–09 (2d Cir.1996).

In ordering the reduction of the punitive damages award to the statutory cap sum of $300,000, pursuant to 42 U.S.C. § 1981a(b)(3)(D), the section applicable to employers of more than 500 employees, the district court found ample evidence to support a finding that the Company acted with malice or reckless indifference to Luciano's rights with regard to gender-based discrimination; namely: (1) testimony that Luciano was given greater job responsibilities without commensurate support staff; (2) testimony, which was not refuted, that Olsten's Chief EEOC officer and Human Resources Director Gelerman called Luciano a "bitch" at an official business function; (3) statistical evidence of wage disparities between men and women in upper level management positions at the Company, as well as disparities in the numbers of men and women holding those positions; (4) testimony that Gelerman did not investigate gender-based disparities in Olsten's workforce, nor did he have a policy or practice of investigating terminations to assure that they were nondiscriminatory; and (5) testimony that Company officials refused to find a job for Luciano, after Olsten allegedly eliminated the one she had, when positions had been created for men whose performance was abysmal. In light of the substantial evidence supporting the punitive damages award, the award here is clearly not so excessive that it " 'shock[s] the judicial conscience and constitute[s] a denial of justice.' " *Vasbinder,* 976 F.2d at 121 (internal quotations and citations omitted).

Moreover, application of the statutory cap to the instant case is consistent with the ratio Congress has considered reasonable between economic and punitive damages. The $300,-

000 punitive damages award is less than twice the actual damages awarded to Luciano, thus falling under the double damages awarded for willful violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et. seq.* and the Equal Pay Act, 29 U.S.C. § 206(d).

Finally, we observe that in order to avoid delving into the Company's income and assets, Olsten requested that the jury be charged that it is financially able to pay any punitive damage award. The jury awarded Luciano $5,000,002 in punitive damages, finding Olsten's discriminatory conduct egregious and its wealth such that a large award was necessary to punish and deter a corporation of this size. Thus, it cannot be said that the district court erred in finding that with regard to a corporation as financially well-situated as Olsten, a punitive damage award of $300,000 was "modest" and would not cause financial ruin.

In sum, the district court's decision to uphold the jury's award of punitive damages, as modified by the statutory limitation of 42 U.S.C. § 1981a, was proper.

We have considered all of the defendants remaining arguments on appeal and find them to be without merit.

### CONCLUSION

The judgment of the district court is affirmed.