**Annie HESTER, Plaintiff–Appellee,**

v.

**BIC CORPORATION, Defendant–
Appellant.**

**Docket No. 98–9465.**

United States Court of Appeals,
Second Circuit.

Argued: Aug. 30, 1999

Decided: Sept. 14, 2000

Michael Delikat, New York, N.Y. (John D. Giansello, Rene Kathawala, Orick Herrington & Sutcliff LLP on the brief) for Defendants–Appellant.

Stephen J. Hyman, New York, N.Y. (Janet C. Neschis, Deanna R. Waldron, Leavy Rosenweig & Hyman, New York, N.Y., on the brief) for Plaintiff–Appellee.

Before: NEWMAN, JACOBS, CARDAMONE, Circuit Judges.

JACOBS, Circuit Judge:

Plaintiff-appellee Annie Hester prevailed in a jury trial on her claims that her employer, BIC Corporation ("BIC"), discriminated against her on the basis of race and retaliated against her in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and 42 U.S.C. § 1981. Defendant-appellant BIC appeals from the final

judgment of the United States District Court for the District of Connecticut (Squatrito, J.) on the grounds, *inter alia*, that the court erred by (i) permitting co-workers to offer lay opinions that the nastiness of Harris's supervisor was racially motivated, and (ii) refusing to charge the jury on what it contends were disputed components of Hester's prima facie case. We agree with BIC that evidentiary errors justify a new trial under the circumstances, but (taken as a whole) we find no error in the court's jury instruction.

## BACKGROUND

### A. *Underlying Facts*

BIC hired Hester in 1986 as an order-processing clerk in its Order Processing Department (the "OPD"). Hester, who is African–American, worked in that position until January 1993, when the OPD was merged with BIC's Customer Service Department into a unified Customer Service Department (the "CSD"). The manager and coordinator of the newly merged CSD was Rick McEttrick, who was assisted by Marilou Beck. McEttrick and Beck were in turn supported by two Customer Service Group Leaders, one for the Office Products ("OP") area and another for the Over–the–Counter ("OTC") area, who were responsible for maintaining price files, implementing new systems, handling customer calls for large accounts, and generally coordinating the Group administration.

Some employees in the merged unit resented Beck's perceived favoritism toward workers who had worked in the old CSD. In September 1993, there was an opening for a Group Leader in the OP area of the CSD. Beck recommended an employee with customer service experience, but McEttrick preferred to appoint someone who had been in the defunct OPD in order to abate post-merger resentments. McEttrick personally chose Annie Hester and promoted her to the Group Leader position.

There is no dispute that Hester was qualified for the Group Leader position. She had had frequent client contact in her six years as an order-processing clerk, and her "outstanding" performance evaluations continued during her year in the merged unit. The outgoing OP Group Leader, Lynn Benson, gave Hester a handwritten list of duties and sat down with her to discuss the new job responsibilities. The first few months went well; Beck increased Hester's salary in January and September 1993.

In early 1994, however, Beck and McEttrick received a series of complaints about Hester from customer salespeople and manufacturer representatives (third parties who find customers for BIC products), including several complaints from BIC's largest clients to senior BIC managers (and relayed to McEttrick). These clients complained of various difficulties and claimed to have lost confidence in her ability to resolve issues for them, citing specific examples of Hester's failure to respond effectively to routine inquiries. In addition, Richard Seigall, BIC's district sales manager, complained about Hester to McEttrick, citing poor writing skills and repeated failures to respond promptly to requests for information.

In June 1994, McKettrick removed Hester from her Group Leader position and transferred her to another department as an EDI Representative, a position that had the same salary and security level, but entailed mainly routine data entry, with minimal supervisory responsibility.

### B. *Prior Proceedings*

Hester filed her complaint against BIC in September 1995, alleging race discrimination in violation of the civil rights statutes. She alleged that Beck sabotaged her performance as a Group Leader by providing next to no training or professional feedback during Hester's ten months in that position. Specifically, the complaint alleged (i) that without the benefit of any support from Beck, and without the benefit of even one performance evaluation as

was required by BIC's policy and procedures manual, Hester could not have known that Beck or anyone else was dissatisfied with her performance as Group Leader; (ii) that Joanne Passariti, a Caucasian female and the other group leader within the CSD, was routinely provided timely feedback and evaluations concerning her ongoing job performance; and (iii) that Beck demoted Hester and then replaced Hester in her Group Leader position with Sharon Zagata, a less qualified Caucasian female.

At trial, Hester acknowledged the rift between former OPD and CSD employees, but testified that Beck's neglect of her was solely attributable to race. Over BIC's objections, Hester's evidence consisted primarily of the testimony of co-workers that Beck neglected Hester and that this neglect, in substance, "must have been" on account of Hester's race. Also over BIC's objection, other co-workers testified regarding the factual circumstances of their own race discrimination claims against BIC. BIC adduced evidence that Hester was removed because she never fulfilled the duties of a Group Leader, not because of her race. After six days of trial, a jury awarded Hester $10,000 in compensatory damages.

BIC appeals chiefly on the grounds (i) that the district court abused its discretion in allowing the jury to consider unsupported lay opinion testimony regarding alleged motivations behind Beck's exhibited hostility towards Hester, and (ii) that the district court erred in instructing the jury only on the ultimate issue of discrimination and not, also, on the prima facie elements of Hester's claim.

## DISCUSSION

### A. *Evidentiary Error*

#### 1. Standard of Review

A district court's evidentiary rulings will be disturbed only if they are "manifestly erroneous." *Luciano v. Olsten Corp.*, 110 F.3d 210, 217 (2d Cir.1997)

(internal quotation marks omitted). This Court will order a new trial if it "find[s] that the introduction of inadmissible evidence was a clear abuse of discretion and was so clearly prejudicial to the outcome of the trial that we are 'convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *Id.* (quoting *Hygh v. Jacobs*, 961 F.2d 359, 365 (2d Cir.1992)). Prejudice is measured in light of the record as a whole.

#### 2. Lay Opinion Testimony

The rules of evidence allow a lay witness to testify in the form of an opinion, provided such testimony "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determinations of a fact in issue." Fed.R.Evid. 701. In this case, four witnesses testified that they observed Beck's condescension toward Hester and that, in their opinion, Beck's manner was attributable to Hester's race. Since these statements are at least peripherally based on the witnesses' own observations, BIC has elected not to challenge admissibility under Rule 701(a). *See United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir.1992) (noting that Rule 701(a) codifies the "familiar requirement of first hand knowledge or observation"). The evidentiary question on appeal is whether the testimony met the helpfulness requirement of Rule 701(b).

Rule 701(b) is designed to "provide assurances against the admission of opinions which would *merely tell the jury what result to reach.*" *Rea*, 958 F.2d at 1215 (*quoting* Fed.R.Evid. 701 *Advisory Committee Note on 1972 Proposed Rule*) (emphasis added). Thus if "'attempts are made to introduce meaningless assertions which amount to little more than choosing up sides, exclusion for lack of helpfulness is called for by [Rule 701(B)].'" *Rea*, 958

F.2d at 1215 (quoting Advisory Committee Note).

"[T]he likely benefits" of lay opinion testimony "must outweigh its costs." 29 Wright and Miller, *Federal Practice and Procedure* § 6255 at 2. Lay opinion testimony may be helpful even if it bears on the ultimate issue in the case, *see* Fed. R.Evid. 704(a) (opinion testimony on ultimate issue must be "otherwise admissible"), but "the costs of lay opinion increases and the benefits diminish the closer the opinion approaches the crucial issues in the case." Wright and Miller, at 2 (emphasis added); *see also Rea,* 958 F.2d at 1215 (noting that "there is no *theoretical* prohibition against allowing lay witnesses to give their opinions as to [the ultimate issue] in the case.") (emphasis added). This is because, even where (as Hester asserts) the opinion is accompanied by supporting facts, "the risk remains that the opinion may distract jurors from their task of drawing an independent conclusion as to an ultimate issue in the case." *Id.*

This Court has not decided whether, in a Title VII action, a lay witness can opine about the employer's discriminatory motivation without personal knowledge of facts that formed the basis of the employer's adverse action. In *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 911 (2d Cir. 1997), we held that Rule 701 allowed a former employee to opine at trial that age played a factor in the plaintiff's termination. That witness, however, had been defendants' employee for almost twenty years, had worked directly under the named defendants, had been personally involved in the procedures that led to the plaintiff's termination, and had been present when the decision to terminate was made. *Id.* at 910. On those facts, we concluded that the lay opinion was admissible because the witness had acquired "personal knowledge of the facts that formed the basis of his opinion" and that "the district court commendably sought to ensure that [the witness's] testimony fo-

cused on those objective facts." *Id.* at 911. Specifically,

> [t]he challenged testimony consisted primarily of [the witness'] description of the factual basis of his opinion that age was a factor in Lightfoot's termination. [The witness] had established a solid foundation of his intimate involvement with [defendants'] operation and his opinion was thus based on *observations about [the defendant's] decisionmaking process.* This testimony was sufficiently helpful to be admissible.

*Id.* at 912 (emphasis added). *Cf. Rea,* 958 F.2d at 1216 (where ultimate issue is defendant's "knowledge" of tax fraud, "[l]ay opinion testimony [on the ultimate issue] will probably be more helpful when the inference of knowledge is to be drawn not from observed events or communications that can be adequately described to the jury, but from such factors as the defendant's history or job experience."); *Krueger v. State Farm Mut. Auto. Ins. Co.,* 707 F.2d 312, 316–17 (8th Cir.1983) (in wrongful death action, testimony as to whether motorist had enough time to avoid hitting decedent was not "helpful" where witness had detailed his underlying observations). This case does not resemble *Lightfoot.*

### (a) Mary Anne Ende

First to testify was Ms. Ende, a file clerk and EDI Representative at BIC who reported to Beck after the CSD merger. Ms. Ende is white. She testified that Beck exhibited favoritism toward employees who had worked in customer service pre-merger and generally treated employees from the old OP Department like "stepchildren." All OP employees were white except Hester. Ende testified that Beck "would walk right by and not even acknowledge [Ende]," that Beck gave Ende the same cold glare Ende had seen Beck give Hester, that Beck's treatment forced Ende to resign, and that Ende told BIC's Human Resource Manager that Beck "pinned me against the wall to quit that company, and that's what I did."

Ende, who observed the level of interaction between Beck and the two group leaders, testified that Beck spent less time in Hester's cubicle than he did in the cubicle of Joanne Passeretti—who is white and came from the department Beck allegedly favored—from which Ende deduced that Beck gave Parsseretti more guidance than she gave Hester. Ende further testified that while everyone complained about Beck, she thought the complaints voiced by Hester and other black employees were "a lot worse." When plaintiff's counsel asked Ende to say whether Beck's treatment of Hester was attributable to Hester's race, Ende answered—over BIC's objection—"that must have had something to do with it." On cross, Ende said she did not know whether Hester was meeting Beck's expectations of her as group leader, or whether customers and manufacturing representatives had complained to Beck (and others) about Hester's handling of their accounts.

### (b) Darlene Miller

Darlene Miller, who is white, came to work at CSD from the old OP Department and worked under Group Leader Hester. Like Ende, Miller testified that Beck was hostile to former OP employees and that she left her job as a result. Miller recalled that Beck was particularly hostile to Hester as compared with her interaction with other Group Leaders, who were white. Miller readily admitted that she had no personal knowledge of the conversations Hester had with salespeople, customers, manufacturing representatives, or her supervisors, including Beck. At a point, Hester's counsel asked Miller why she thought Beck treated Hester differently. Over BIC's objection, Miller testified that she "ha[d] no idea why Marilou was so different towards Annie," but that "the only thing I can come up with is it is a racial thing. I've been picking my brain for weeks trying to figure it out and that's the only thing I can come up with, because Marilou Beck was mean to everybody in order processing, but she was more mean to Annie."

In a colloquy with counsel the district court reconsidered the ruling that permitted this testimony: "I think I made a mistake when I allowed [Miller] to speculate [that] it must have been race and she didn't know anything else.... It's not necessarily an automatic jump there." The next day, the court ruled that the testimony would stand, but undertook to think about it further; the court ultimately rested on its initial ruling to admit the testimony.

### (c) Patricia Wright.

Next to testify was Patricia Wright, an African–American and a former receptionist who was stationed outside of the CSD, and from that spot could not observe how Beck treated Hester or what went on in the CSD. Wright's testimony, given over BIC's objections, was that she had been temporarily suspended by McKettrick and that in her opinion this suspension was attributable to her race. Wright went on to testify that she had been the target of racist telephone calls while working BIC's switchboard, although she could not identify the source, did not know whether they originated from within BIC, and recalled that BIC changed its 1–800 number in response to her complaints. Wright further testified to the details of her own race discrimination claim against BIC, a claim which the Connecticut Commission on Human Rights dismissed on grounds that Wright "failed to present any additional evidence to show that [BIC's] reasons [for suspending her] were false and/or pretextual." Finally, Wright described the "environment" at BIC as "cold and uncomfortable" and testified that the coldness she felt was attributable to her race.

### (d) Lillian Turner

Lillian Turner and Hester worked at different locations in BIC's office and had different supervisors. During the six years she worked at BIC (1988 to 1994),

she observed the interaction between Beck and Hester on only "two or three" occasions. Still she was allowed to testify, over BIC's objections, that based on those occasions Beck exhibited a "borderline" disrespect that was attributable to Hester's race. Turner heard Beck talk down to Hester, she did not observe Beck acting with condescension or disrespect to white employees, and opined that Beck was condescending towards Hester because Hester is African–American. When defense counsel tried to obtain the specifics of the conversations Turner observed, the court cut off the line of questioning. Turner also testified that there was general discrimination in the workplace at BIC; that she had her own lawsuit pending against BIC (which did not accuse any of Hester's supervisors); and that the reasons for her treatment must be attributable to race since "I knew something wasn't right. The more and more I began to look at the situation, I knew it was based on my color, that I was black, because there was no other cause."

\* \* \*

■ Hester argues, on analogy to *Lightfoot*, that all four witnesses had "personal knowledge" of Beck's condescending manner. We disagree. *Lightfoot* affirmed a ruling that allowed a witness to opine as to why plaintiff suffered an adverse employment action, but *Lightfoot* concluded that such testimony was helpful to the trier of fact because (a) the witness had "established a solid foundation of his intimate involvement with [the defendant's] operation,"; (b) the witness's "opinion was thus based on observations about [the defendant's] decision making process,"; and (c) the district court "sought to ensure that [the witness's] testimony focused on these objective facts." *Id.* 110 F.3d at 911–12. *See also Rea*, 958 F.2d at 1216 (where witness can fully testify as to his or her observation of the defendant's conduct the witnesses opinion as to ultimate issue "will often not be helpful within the meaning of Rule 701 because the jury will be in as

good a position as the witness to draw the inference. . . .").

None of Hester's four witnesses was involved in BIC's decision-making processes, or had personal knowledge of it. Nor had they any basis for knowing whether Hester was adequately performing her duties as a Group leader. Their testimony about Beck's racist motivations was not "focused on objective facts," but instead consisted of the witnesses' subjective impressions that Beck's condescension to Hester was attributable to Hester's race.

There is evidence that CSD employees (particularly former members of the former OPD) chafed under Ms. Beck's harsh managerial style, but as the district court suggested (in an understatement), "it is not an automatic jump" to infer that Beck is racist. One purpose of Rule 701(b) is to prevent lay witnesses from suggesting that the jury take such a jump. *See Rea*, 958 F.2d at 1215 (holding that "[rule 701] provide[s] assurance[s] against the admission of opinions which would merely tell the jury what result to reach"). We conclude that the opinion testimony concerning Beck's racial motivation was inadmissible under the Rule.

A number of federal appellate decisions support this conclusion. In *Mitroff v. Xomox Corp.*, 797 F.2d 271 (6th Cir.1986) the court held admissible the lay opinion of an assistant manager that the employer engaged in patterns of age discrimination:

[T]he question of whether age discrimination existed or not was the ultimate issue, not just a fact in issue. Although testimony which embraces an ultimate issue is not objectionable (Fed.R.Evid. 704), *seldom* will be the case when a lay opinion on an ultimate issue will meet the test of being helpful to the trier of fact since *the jury's opinion is as good as the witness' and the witness turns into little more than an "oath helper."*

*Mitroff*, 797 F.2d at 276 (6th Cir.1986) (emphasis added).

Similarly, the First Circuit has held that conclusory lay opinions given at deposition—to the effect that plaintiff was ejected from a restaurant by reason of his race—were properly excluded because the depositions contained no foundation for the inference of racial animus on the part of the restaurant employees. *See Alexis v. McDonald's Restaurants,* 67 F.3d 341 (1st Cir.1995). In that case, the deponent inferred racial animus from (variously) their observations that one of the defendants reacted "angrily" toward the plaintiff and with a "negative tone in her voice," was "unfriendly," "uncooperative," "high strung," "impolite," and had "no reason" to eject the plaintiff. *Id.* at 347. The court concluded that such observations did not support an inference of *"racial* animus," *id.* (emphasis in original), because

> [a]lthough these observations may be entirely compatible with a race-based animus, there simply is no foundation for an inference that [defendant] harbored a racial animus toward [plaintiff] or anyone else, absent some probative evidence that [defendant's] petulance stemmed from something other than a race-neutral reaction to a stressful encounter . . . .

*Id.* (internal citation omitted). *See also Connell v. Bank of Boston,* 924 F.2d 1169, 1177 (1st Cir.1991) (lay opinion—that employer was "determined to eliminate . . . senior employees"—pointed to no specific facts to buttress such a "broad assertion."); *Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1544 (10th Cir.1995) (determining inadmissible the lay opinion of coworker that sexual harassment defendant had " 'a problem with women who were not between the ages of 19 and 25 and who weighed more than 115 pounds' "); *cf. Willco Kuwait (Trading) S.A.K. v. deSavary,* 843 F.2d 618, 624 (1st Cir.1988) (lay opinion testimony which does little more than tell the jury what result to reach, should not be admitted).

■ We follow the reasoning of *Lightfoot, Rea* and opinions in other circuits,

and hold that in an employment discrimination action, Rule 701(b) bars lay opinion testimony that amounts to a naked speculation concerning the motivation for a defendant's adverse employment decision. Witnesses are free to testify fully as to their own observations of the defendant's interactions with the plaintiff or with other employees, but "the witness's opinion as to the defendant's [ultimate motivations] will often not be helpful within the meaning of Rule 701 because the jury will be in as good a position as the witness to draw the inference as to whether or not the defendant" was motivated by an impermissible animus. *Rea,* 958 F.2d at 1216. The four witnesses here testified that they observed Beck treat Hester with (variously) condescension, coldness, hostility or disregard, as compared with the three or so other Group Leaders, who were white. A jury can draw its own conclusions "from observed events or communications that can be adequately described" to it, such as the observed differential treatment described by Hester's witnesses. *Id.* at 1216. But their speculative lay opinion that this differential is attributable to race rather than anything else, is not helpful in this case because it "merely tell[s] the jury what result to reach." *Id.* at 1215.

■■ These errors were not harmless. This case was factually very close and we are "especially loath to regard any error as harmless in a close case, since in such a case even the smallest error may have been enough to tilt the balance." *United States v. Colombo,* 909 F.2d 711, 714 (2d Cir.1990) (quoting 3A C. Wright, *Federal Practice and Procedure* § 854, at 305 (2d ed.1982)) (internal quotation marks omitted). Hester relied heavily at trial on how differently she was treated by Beck as compared to Beck's treatment of peers who were white, and asked the jury to draw from that an inference of discrimination. All four witnesses who proffered that testimony were allowed improperly to draw the inference for the jury. The prej-

udice to BIC caused by the district court's rulings was thus significant.[1]

### B. *Jury Instruction*

 BIC objects to the following excerpt from the district court's charge on grounds that it does not instruct the jury that Hester had the burden of proving that she was performing at a level that met BIC's legitimate expectations and that she was subject of an adverse employment action:

> In order to recover ... the plaintiff must prove by a preponderance of the evidence that the defendant intentionally discriminated against her, that is, the plaintiff's race must be proven by a preponderance of the evidence to have been a substantial or motivating factor in the defendant's decision to remover her.

 A jury charge is erroneous if the instruction misled the jury as to the proper legal standard or did not adequately inform the jury of the law. *See Luciano v. Olsten Corp.*, 110 F.3d 210, 218 (2d Cir.1997). Challenged jury instructions are reviewed *de novo*, but this Court will reverse only if all of the instructions, taken as a whole, caused the defendant prejudice. *United States v. Bok*, 156 F.3d 157, 160 (2d Cir.1998); *see also Thornley v. Penton Publ'g, Inc.*, 104 F.3d 26 (2d Cir.1997) (holding that to grant a new trial the error must be more than harmless).

We accept BIC's position that *disputed* elements of a prima facie case must be submitted to a jury, *see Thornley*, 104 F.3d at 29–30 (proper to instruct jury on disputed element of plaintiff's qualification), but we find no error in the foregoing charge. As to meeting BIC's employment expectations, we think the charge, read as a whole, sufficiently informed the jury of this issue, and that as to the adverse employment action, the underlying facts were essentially undisputed, and there was no real factual dispute for the jury to resolve.

---

**1.** The author of this opinion would go one step further and find that on the balance of

### CONCLUSION

The district court's judgment on jury verdict for plaintiff is vacated and this case is remanded for a new trial in accordance with this opinion.

record evidence, judgment as a matter or law be should be directed in favor of BIC.