**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JEFFERY T. PAGE,

     Petitioner - Appellant,

v.

COMMANDANT, United States
Disciplinary Barracks,

     Respondent - Appellee.

No. 20-3005
(D.C. No. 5:19-CV-03020-JWL)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **MURPHY**, and **McHUGH**, Circuit Judges.
_____

Jeffery Page is a prisoner in the United States Disciplinary Barracks at Fort

Leavenworth, Kansas, serving a 26-year sentence on a conviction of unpremeditated

murder by a military court-martial. He appeals the denial of his application for a writ of

habeas corpus, *see* 28 U.S.C. § 2241, by the United States District Court for the District

of Kansas. He raises two grounds for relief: insufficient evidence of guilt and ineffective

assistance of counsel. We have jurisdiction under 28 U.S.C. §§ 1291 & 2253(a).

Because both grounds were fully and fairly considered by the United States Army Court

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of
the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive
value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

of Criminal Appeals (ACCA) on direct appeal, we affirm the judgment of the district court.

## I. BACKGROUND

### A. Factual Background

Although Page denies that he had the requisite intent to commit murder, the facts of his conduct are undisputed. On May 15, 2014, Page, a specialist in the United States Army, was on assignment in Jordan to guard an American Patriot Missile battery. As Specialist AP was bringing lunch to Page, Page aimed his rifle at AP from about 55 feet away and squeezed the trigger. A bullet struck AP in the head, causing his death.

### B. Procedural History

Under an agreement with the prosecution, Page pleaded guilty to involuntary manslaughter, 10 U.S.C. § 919. But the agreement allowed the government to try him before a military judge on the more serious charge of unpremeditated murder, 10 U.S.C. § 918. The dispositive issue at trial was whether Page had the specific intent to kill or inflict great bodily harm on AP when he pulled the trigger.

Page testified that the shooting was accidental because he failed to realize that a bullet was chambered in his rifle. He said that his unit had a practice of "dry-firing," whereby soldiers aimed and fired *unloaded* weapons at each other to practice their breathing and trigger-squeezing techniques. That was what he claimed to be doing when he aimed and fired at AP. Page explained that he had chambered a round into his rifle the day before the shooting in response to a suspected military threat but had forgotten to

remove the round after the threat passed, and no one else with access to the rifle checked to ensure it was unloaded.  As a result, he unwittingly fired a live round.

The government challenged that account.  It contended that Page, along with much of the rest of his squad, disliked AP because he had received an early promotion to specialist despite being generally viewed as a below-average soldier.  The government presented evidence—both witness testimony and Page's own writings—that Page had a "confident" and "cocky" attitude and felt demeaned to be of equal rank to AP.  There was evidence that Page had stated that he hated AP and wanted to punch him in the face and that he had directed homophobic slurs at him.  The sergeant guarding him shortly after the shooting reported that Page said, "The guys are going to find this funny.  No one liked him and I ended up shooting him."  Aplt. ACCA Br. at 39.  Another sergeant testified that he had seen Page clear his weapon the morning of the shooting, and the government presented evidence that the military threat that purportedly led him to chamber a round had occurred at least a week before the shooting.  In addition, there was testimony that the soldiers had been told to dry-fire only on *inanimate* objects.

Page appealed to the ACCA, making two arguments relevant to his present appeal.  He devoted 31 pages of his opening brief to arguing that there was insufficient evidence to sustain the murder conviction.  And he devoted 11 pages of his briefs to arguing ineffective assistance of counsel.  He claimed that his trial counsel had failed to present critical evidence regarding Page's state of mind when he shot AP:  namely, potential testimony by seven witnesses who were not called at trial and another five who were called but not asked to provide the intent testimony, and two military investigative reports

3

on the shooting. The intent testimony of the 12 witnesses had been presented at a pretrial proceeding but not offered at trial.

Six of those not called were members of military teams that investigated the shooting. Page says these individuals would have testified to their findings regarding Page's intent (or lack thereof). The other was the junior medic who responded to the shooting and, according to Page, would have testified that Page's demeanor after the shooting did not lead the medic to believe he had acted with intent.

The five potential witnesses who testified (but on other matters) had all observed Page around the time of the shooting. Staff Sergeant Colin Wyvill, a government witness, was the leader of Page's unit. He testified that he had smoked cigarettes with Page 15–20 minutes before the shooting, during which time Page appeared normal as they discussed his reenlistment decision and ideas for career advancement. Wyvill also testified to the platoon's general dislike of AP, especially after his promotion, but did not note any special animosity from Page toward AP. Page claims Wyvill could have also testified that based on his knowledge of Page, he did not believe Page intended to kill AP.

Sergeant Thomas Nys, also a government witness, was another officer in Page's unit. He testified that he saw Page clear his weapon the morning of the shooting and that AP was generally disliked by the platoon. Page claims that Nys could have further testified that he had never observed Page act in a way that indicated he intended to harm AP.

Private First Class Kevin Macaskill, called by both the government and defense, was on duty with Page and stood six to eight inches away from him when the shot was

4

fired. He testified that Page was looking through his rifle's cracked optic just before the shot was fired, and he questioned whether Sergeant Nys had visually inspected Page's weapon the morning of the shooting. Page claims Macaskill could have further testified that he had never observed Page act in a way that indicated he intended to harm AP.

Specialist Freddy Curley, a defense witness, was delivering lunch alongside AP when the shot was fired. He testified to the unit's procedures for clearing weapons. Page claims he also could have testified that after the shooting Page looked "freaked out" and kept saying "misfire."

Finally, Sergeant Tristian Adams, also a defense witness, was the platoon's medic, who arrived at the scene soon after the shooting. He testified that Page offered to help the medics. He also testified that he believed Page was in shock immediately after the shooting. Page's brief to the ACCA did not describe what helpful testimony Adams might have provided.

As for the two reports, the first was issued by the Air Force Office of Special Investigations (AFOSI) and was based on five hours of investigation shortly after the shooting. The Criminal Investigation Command (CID) took over the investigation the day after the shooting. According to Page, AFOSI concluded that the shot was a negligent discharge, though the relevant AFOSI agents said in interviews with defense counsel that such a characterization would have been premature given the brevity and preliminary nature of AFOSI's investigation. The second report was CID's forensic analysis of Page's laptop. Page argued that his attorney should have introduced the CID

5

report, which stated that investigators found no evidence on the laptop indicating Page's intent to kill AP.

The ACCA rejected Page's claims and affirmed his conviction. It summarily dismissed the evidence-sufficiency claim but discussed more fully the ineffective-assistance-of-counsel claim. It applied the two-prong test for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). It said that Page's attorney did not provide deficient representation by not offering the testimony regarding Page's intent because "it is impermissible for a lay witness to testify as to their personal opinion as to whether appellant possessed a specific motive or intent to kill." ACCA Order at 3 (citing Military Rule of Evidence 602); *see also* Military Rule of Evidence 701; *cf. Hester v. BIC Corp.*, 225 F.3d 178, 185 (2d Cir. 2000) ("Witnesses are free to testify fully as to their own observations of the defendant's interactions with the plaintiff . . . , but the witness's opinion as to the defendant's ultimate motivations will often not be helpful within the meaning of Rule 701 because the jury will be in as good a position as the witness to draw the inference as to whether or not the defendant was motivated by an impermissible animus." (brackets and internal quotation marks omitted)); 3 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 7:5, p. 735 (4th ed. 2013) ("It is very hard to say how far a lay witness should be allowed to go in interpreting the mental state of another."). The ACCA further explained that it "was a likely unsound tactical strategy" to introduce the proposed evidence because it would have allowed the government to rehighlight much of its favorable evidence on cross-examination. ACCA Order at 4 n.4. And the court further discerned no prejudice from the failure to offer the

evidence, stating that there was no "reasonable probability the result of the proceeding would have been different" because the evidence "was either inadmissible or of such minimal probative value that there is no reasonable probability its presentation at trial would have . . . created a different result." *Id.* at 5 (internal quotation marks omitted).

The United States Court of Appeals for the Armed Forces denied Page's petition for review, thereby exhausting all direct appeals. *See Manual for Courts-Martial, United States, Rules for Courts-Martial* (2012), Rule 1209(a)(1)(B).

## II.     ANALYSIS

Although we review de novo a district court's denial of habeas relief, "our review of court-martial proceedings is very limited." *Thomas v. U.S. Disciplinary Barracks*, 625 F.3d 667, 670 (10th Cir. 2010). As the Supreme Court has said, "It is the limited function of the civil courts to determine whether the military have given fair consideration to each of [the] claims [for habeas relief]." *Burns v. Wilson*, 346 U.S. 137, 144 (1953). Review by this court is proper only if "(1) the asserted error is of substantial constitutional dimension, (2) the issue is one of law rather than disputed fact, (3) no military considerations warrant a different treatment of constitutional claims, and (4) the military courts failed to give adequate consideration to the issues involved or failed to apply proper legal standards." *Thomas*, 625 F.3d at 670–71. The fourth requirement is often dispositive. *See id*. at 671; *Roberts v. Callahan*, 321 F.3d 994, 995 (10th Cir. 2003) (civilian courts do not reconsider grounds for relief that were "fully and fairly reviewed in the military courts").

We have repeatedly held that a military court has given fair consideration when an issue is adequately briefed and argued to it. *See Thomas*, 625 F.3d at 671–72; *Roberts*, 321 F.3d at 997; *Watson v. McCotter*, 782 F.2d 143, 145 (10th Cir. 1986). This is true even if the military court's opinion "summarily disposed of the issue with the mere statement that it did not consider the issue meritorious or requiring discussion." *Watson*, 782 F.2d at 145; *see Thomas*, 625 F.3d at 672 ("We . . . decline to presume a military appellate court has failed to consider all the issues presented to it before making a decision."). We have applied this highly deferential standard of review to claims of ineffective assistance of counsel. *See, e.g.*, *Thomas*, 625 F.3d at 672; *Watson*, 782 F.2d at 145.

In this case Page's two grounds for relief were both extensively briefed to the ACCA. The ACCA's opinion devotes eight paragraphs to analyzing the ineffective-assistance-of-counsel claim. And even though that opinion summarily dismissed the sufficiency-of-the-evidence claim, the discussion of ineffectiveness reflects the court's familiarity with the evidence and an assessment of its strength. Both of Page's claims were fully and fairly considered, mandating that the application for relief be denied.

## III. CONCLUSION

We **AFFIRM** the district court's judgment.

Entered for the Court


Harris L Hartz
Circuit Judge

8